Garrett MORRIS et al., Appellants,

v.

O. P. LEONARD et al., Appellees.

No. 17018.

Court of Civil Appeals of Texas.

Fort Worth.

May 16, 1969.

Rehearing Denied June 13, 1969.

Garrett Morris, Fort Worth, for appellants.

McGown, Godfrey, Decker, McMakin, Shipman & McClane, and Warren W. Shipman, III, Hodges & McMullen, Fort Worth, for appellees.

## OPINION

MASSEY, Chief Justice.

In the trial court Garrett Morris, et al., as plaintiffs, brought suit against defendants O. P. Leonard, et al. Plaintiffs alleged an affirmative cause of action for damages flowing from an alleged breach of implied covenant of warranty as to quantity of value in a certain building when the building was sold (in 1953) to "promoters" of a life insurance corporation (which was to be known as the Chiro Life Insurance Company). In general, the circumstance upon which plaintiffs founded their contention that there was a covenant of warranty in the 1953 transaction was a representation of defendants made to the aforementioned "promoters", inducive of the purchase of the building, that they had paid therefor approximately $1,000,000.00 "in trade". The plaintiffs' theory was that they were entitled to complain of the defendants' breach under right as successors in the chain of title of those who were the "promoters" in 1953, or to rights of the Chiro corporation (as result of constructive fraud under a theory that the defendants knew the building was purchased to become its asset).

(Had such a cause of action been instituted by owners thereof, as plaintiffs here claim to be, the relief sought might well have been that of contract rescission, with a restoration of the parties' status quo. Due to passage of time, and to other factors, relief of such character would be impractical in the case under consideration even if equitable right thereto should be made to appear.)

In response to the affirmative claim advanced by the plaintiffs (as based upon the 1953 transaction) the defendants denied the existence of any implied warranty, and asserted right to avoidance in any event under allegations of the two and four year limitation statutes, waiver, estoppel, compromise and settlement, ratification and release.

By cross-action and counterclaim the defendants sought recovery of plaintiffs for their respective obligations past due and owing for the balance due on what had initially been a $550,000.00 note; the foreclosure of the deed of trust upon the building in question (as security for the balance owing on the note); for the balance due on another note for $150,000.00 and for foreclosure of a pledge lien on certain shares of stock in Chiro Life Insurance Company, which was security for that note; and for the establishment of the balance due on a certain $75,000.00 surplus debenture obligation committed to them.

In response to the counterclaim of the defendants the plaintiffs alleged that the notes in question were illegal; that obligations thereon were subject to condition(s) precedent which had not been performed; failure of consideration; breach of implied covenant of warranty (arising out of transaction between plaintiffs and defendants in 1955 when the former acquired all the stock of Chiro Life Insurance Company); and fraud arising out of misrepresentations that the building in question (part and parcel of the 1955 transaction in transfer of corporate stock) was worth a million dollars.

In reply to the defenses which were brought forward by plaintiffs' allegations in response to their counterclaim the defendants denied the facts alleged as support for the plaintiffs' theory of defense, and additionally—as applied to rights asserted and based upon the 1955 transactions—plead compromise and settlement, ratification, release, and the two and four year limitation statutes. The defendants also plead waiver and estoppel as applicable to plaintiffs' attempts to make the assertions against defendants on the latters' cross-action, with predicate therefor asserted to

have arisen in and by the acts of the plaintiffs occurring from 1956 to date of trial.

Upon conclusion of all the evidence the trial judge, expressing the opinion that there was no dispute between the parties as to any material fact, withdrew the case from the jury's consideration and rendered judgment on the theory that such was required as a matter of law. Thereby the plaintiffs were denied any affirmative relief, and the defendants were in general granted all the relief they sought, viz: personal judgments, foreclosures upon property with the proceeds from sales thereof to be applied upon said indebtedness by judgment, and declarations settling liabilities between the parties. Plaintiffs perfected an appeal.

Affirmed.

A basic premise, under which the plaintiffs claim, is that the defendants were guilty of actionable fraud as against the men who organized the Chiro Life Insurance Company, in the sale and transfer to them (in 1953) of the building in question at a sale price of $873,750.00. This building was the Insurance Building. The men referred to were those heretofore called "promoters". They will thus be referred to hereinafter.

Defendants' actionable fraud (under plaintiffs' theory) lay in their representations to the promoters, in 1953, that they had paid $1,000,000.00 for the Insurance Building "in a trade" of properties between themselves and third persons. Coupled therewith, and of importance under the plaintiffs' theory, was the fact that defendants were at all times aware that the intended purchase by the promoters was for the purpose of transferring the building to the new life insurance company they hoped to organize (and which was organized prior to the closing of the 1953 purchase and sale transaction) at the highest possible valuation as corporate property belonging to a life insurance company. In that respect the defendants had endeavored to aid and abet the promoters in obtaining an approval by the proper authorities in the State's Insurance Department of a $950,-000.00 appraisal of building "valuation". Decision of the Department, in respect to the evaluation of property acquired or to be acquired by a life insurance company and held as part of its capital assets, is controlling in respect to value thereof as part of the capital of such a corporation.

Under plaintiffs' allegations and evidence, the promoters of the life insurance company, which they intended to and did call by the name Chiro, were innocent dupes who were defrauded by the defendants, because of the latters' representation that $1,000,000.00 had been paid "in a trade" for the Insurance Building. The promoters purchased the building at what would be $873,750.00, as a cash price, at approximately the same time the defendants acquired it "in trade". The promoters took title, executing therefor their personal notes, as to one of which security was afforded by a Deed of Trust on the building; then immediately thereafter transferred title over to Chiro. This was a three-way transaction wherein Chiro assumed the obligation to pay all the indebtedness evidenced by the notes, and the defendants released the promoters from all liability thereon.

That such would be done was theretofore understood and agreed by the defendants, the promoters (as individuals), and Chiro (as a corporation and by and through its officers, formerly the promoters, who owned all the stock and therefore had total ownership). The only consideration paid by the promoters, other than by way of notes evidencing indebtedness to the defendants, was an amount in cash which we may take as the figure of $25,-000.00. This amount was paid by the promoters, pursuant to contract with the defendants, to third parties as the real estate commission for promotion of the sale of the Insurance Building. The only consideration received by the defendants were notes ·totalling $848,750.00, one of which

was in the amount of $750,000.00 secured by the Deed of Trust.

It is of importance to take note of the fact that the success hoped for by the promoters of Chiro failed to materialize. In 1954, by agreement with Chiro and those who had been its promoters, and because the Chiro stock was pledged as security for a $98,750.00 loan, the defendants took all the capital stock (with the resulting total ownership of all the Chiro property, inclusive of the Insurance Building), and the promoters ceased to have any connection with either Chiro or the Insurance Building. Since that time the promoters have made no demands upon defendants. Chiro, owned by and in the possession of defendants, could of course make no demands.

It was thereafter that plaintiffs first became associated with the defendants in relation to Chiro and the Insurance Building. In 1955 plaintiffs bought Chiro through a purchase of defendants' stock. Involved in, and carried along as a necessary incident to the purchase, was the transfer of ownership of the Insurance Building. Title thereto was in Chiro, burdened, of course, by the amount Chiro owed on the notes for which the building stood as security. The burden was eased, however, by an agreed reduction of the balance owing.

However, our initial task is to test whether there was a jury issue in respect to actionable fraud in the defendants' 1953 sale to the promoters of Chiro.

We have concluded that there was no actionable fraud in 1953. Evidence in the record reflects that there is an absence of any issue of fact upon the matter of whether the defendants actually paid $1,000,000.00 "in a trade" for the Insurance Building. They did pay such amount through credits agreed upon, applicable to property "traded", by and between the parties to the transaction pursuant to which it was acquired. There having been no misrepresentation there would be no basis for complaint of actionable fraud, and no cause of action could be said to have ac-

crued to the promoters. A representation by the defendants in the nature of representations of opinion upon the value of the building would furnish no basis for a case of fraud.

But, assuming such a cause of action could be said to have accrued, such was never at any time assigned by the promoters. It is our opinion and conclusion that if it ever arose, and if such cause of action persists, the right arose and remains in the original promoters.

But, assuming that such a cause of action was transferred by the promoters to Chiro, and/or became a cause of action belonging to it as against defendants as initial owner, that cause of action would in 1954 have become a property belonging to the defendants—as the succeeding owners of all the Chiro stock. Necessarily resulting was the merger and extinguishment of the cause of action whether considered to have originally belonged to Chiro or to its "promoters".

We have concluded that principles of law relative to the promotion and organization of corporations are without application in the control of proper disposition of the case before us. It is contended that they do have such effect. For example, it is plaintiffs' theory that equity would seize upon the 1953 transaction in the interest of the public and the innocent persons who were anticipated to become and did become policyholders of Chiro. The contention might be accorded some verity in another case, but not in this. There having been nothing illegal in the 1953 transaction *as actually consummated* there could be nothing in events thereafter occurring which could make of it an illegal contract nor operative to relieve a party thereto of attendant liability.

In the promotion, organization, and operation of corporations there is a requisite of "good faith" between parties who are in a fiduciary relationship with one another. There is an inhibition against any

manipulation which results in any fraud perpetrated as the result of "stockwatering", particularly as applied to one who profits from the dilution of the substance of financial stability of a corporation. Reference is made to the text of 18 Am. Jur.2d, p. 650, et seq., "Corporations", Chapter VI, "Promoters and Promotion of Corporations", Sub. B, "Duties and Liabilities of Promoters to Corporation, Stockholders, and Subscribers", and the sections thereof beginning at Sec. 109, "Generally; fiduciary relationship". Reference is also made to the text of 18 C.J.S., p. 547, et seq., "Corporations", Chapter V, "Promotion of Corporations", Sub. B., "Rights, Duties, and Liabilities as Between Promoters and Corporation", and the sections thereof beginning at Sec. 144, "In general", and to the same text at p. 667, et seq., Chapter VIII, "Capital, Capital Stock, and Shares", Sub. E, "Consideration for Issue of Stock and Payment Therefor", and the sections thereof beginning at Sec. 236, "Necessity for Payment".

■ The same principles which declare the liability of promoters, etc., as result of activities which result in the "watering" of the stock of a corporation, or the impairing of its capital structure, likewise apply to one who conspires with such a promoter or aids and abets his "stockwatering", etc. Furthermore, and as applied to a third person who manipulates one who is innocent in the premises so that as the result of the manipulation the corporate structure and the corporate stock becomes thus diluted there would exist similar liability.

From our analysis of the argument of the plaintiffs such must be in substance what they contend—i.e., that the promoters were innocent, but were duped by the defendants so that as a result there was "water" in the stock of Chiro and, upon merger of Chiro and Morris Plan the same "water" would be in the stock of the latter. In that connection plaintiffs refer to the fact that the defendants furnished their own servant to promote the Insurance Department's approval of the Insurance Building at a valuation of $950,000.00, presumably in behalf of and to further the interest of the promoters, but, say plaintiffs, principally to further defendants' own interests in that they had the promoters contract to purchase their building, the binding effect of which was contingent upon such approval.

It is noted, however, that there was a total failure in what might be characterized as the defendants' attempt, through their loaned servant, to aid the promoters to obtain the approval of such $950,000.00 building valuation. Though such approval was at first given by the Insurance Department it was withdrawn before defendants and the promoters had concluded their transaction in reliance thereon, or pursuant to their contract.

■ The defendants and the promoters did subsequently conclude a sale of the Insurance Building. However, that sale was upon another and different contract—one in connection with which nothing improper could be said to have been done by the defendants (as by conspiracy with the promoters, or by way of a manipulation of the promoters) so as to accomplish it. Assuming that by the promoters' subsequent delivery of the Insurance Building to Chiro its stock was "watered" and/or the value at which the Insurance Building was taken as a part of its capital and was so inflated that its financial stability was impaired, the transaction whereby this was done (one by and between the promoters and Chiro) would not be a transaction the result of which created in Chiro any cause of action against the defendants. If as a result of such a transaction a cause of action ever existed it would have belonged to the promoters. See 37 Am.Jur.2d, p. 396, "Fraud and Deceit", Sec. 299, "Effect of assignment or transfer; rights of assignee."

Whatever is received becomes a part of the capital of the corporation. Necessarily it is upon and as result of some agreed valuation that property such as the Insur-

ance Building becomes part of such capital, the measure being monetary value. For the corporation it is its representatives who are vested with authority to agree upon the value. Only in the event the agreement of these representatives should be declared unfair or dishonest would disavowance of the transaction be sustainable and the transaction set aside in a suit in which they would be primary defendants. It would be possible to reach other defendants, if at all, by and through those who might be found to be primarily liable. Such disavowance would ordinarily be a right possessed only by the corporation, its stockholders, and their privies. An exception would be an instance where the public interest was involved.

■ Aside from the want of plaintiffs' entitlement to complain (as successor to Chiro and/or to its stockholders' right of action), and treating the case as though it were one prosecuted by the promoters themselves, or through them by Chiro, there appears nothing in the actions of the defendants in which any cause of action against them might be founded. The plaintiffs' subsequent discovery of the amount of revenue stamps on the deed under which the defendants originally received title to the Insurance Building was a circumstance in which they believed their cause of action could be grounded. Revenue stamps affixed to the deed indicated the fact, and created the presumption, that the consideration paid by the defendants for said building was only $500,000.00. In other words, say plaintiffs, the number of stamps constitute evidence that the $1,000,000.00 "in trade" represented to have been paid, and an inducement because of which Morris Plan purchased Chiro stock, was not in fact paid by defendants—and that there was falsity in their representation that $1,000,000.00 had actually been paid.

The "presumption" to that effect in plaintiffs' favor, which under one hypothesis could be said to have become arisen, vanished upon the introduction of undisputed affirmative evidence that the consideration the defendants had actually paid for the property was the $1,000,000.00 as represented. Proof to that effect not having been countered by any evidence to the contrary, and affirmed by additional evidence from witnesses whose credibility was not cast in issue, will be deemed conclusive. 23 Tex.Jur.2d, p. 101, et seq., "Evidence", Ch. IV, "Presumptions and Inferences", Sec. 65, "In general; Definitions and distinctions", and Sec. 70 (p. 112), "Rebuttal of disputable presumptions".

■ Aside from the question of plaintiffs' entitlement to complain, and assuming such right existent, there was nothing in the 1953 transaction, pursuant to which the defendants parted with their title to the Insurance Building and took lien rights thereon as security for payments of notes representing a part of the purchase consideration, which could have been said to be tainted with any illegality. Therefore any new promise to pay such notes—as part of purchase price consideration for the Insurance Building—could not be tainted by any wrong or illegality, through substitution of the new promise to pay, because there was no taint to follow the transfer.

The situation simply does *not* present a case having analogy to that upon which plaintiffs found a rather compelling argument. We are certain that ours is not a transaction germane to an illegal transaction but collateral to it; character of the transaction in Wegner Bros. v. Biering & Co., 65 Tex. 506 (1886).

■ Even if there had been any actionable wrong in the organization of Chiro, or in the transaction whereby the Insurance Building became its property, that fact would not contaminate plaintiffs' transaction with the defendants in 1955. (What is meant is: if there had been anything theretofore done by anyone, pursuant to which there was occasioned any "water" in the stock of Chiro, or as result of which its capital structure was impaired, it would nevertheless be immaterial as applied to

the 1955 transaction. Chiro and the stock of that corporation, whatever its condition, "watered" or not, was merely the subject of a transfer transaction between the parties in 1955.)

It was in response to the suit by defendants, by way of cross-action for collection of indebtedness evidenced by notes due from plaintiffs, that plaintiffs attacked the rights thus asserted against them. Defendants' suit to reduce the plaintiffs' indebtedness to judgment had reference to that indebtedness arisen pursuant to the transaction (of 1955) when the defendants sold plaintiffs all their Chiro stock. Pursuant to subsequent transactions there were alterations in those obligations initially arisen. However, it was in reference to the original sales transaction that plaintiffs defensively asserted fault, along with a claim of illegality or unenforceability of the obligations upon which the defendant sued.

To be remembered is the fact that in 1954 the defendants succeeded to all the stock in Chiro. As a result the Insurance Building constituted property belonging to Chiro, but mortgaged to defendants. The defendants could handle such property as they chose. In other words they could transfer the building to themselves, as a transfer from Chiro (which they completely owned), or they could leave it as it was —as property belonging to Chiro. Defendants' ownership was complete, either direct or through agent. There seems to be no question but that all interested parties at that time deemed the building to have a greater value as the home office location of a life insurance corporation, with title in such corporation, than would be the case if defendants caused themselves to appear as direct owners.

Incident to such conclusion on the part of the defendants, plaintiff Garrett Morris was approached by their attorney for the purpose of ascertaining whether Morris' services were available to operate Chiro as its manager and as trustee for the defendants, with possible end in view of Morris' purchase of Chiro (through purchase of

defendants' stock). Such a purchase would of course carry with it the Insurance Building; though Chiro also owned some office furniture, supplies, etc. Garrett Morris was principal stockholder and officer of the Morris Plan Life Insurance Company, which did not own a home office building as part of its capital structure.

Perhaps it was contemplated from the beginning that if Mr. Morris would take over the operations of Chiro he would decide to merge it with his own company pursuant to a stock purchase transaction as result of which Morris Plan would own Chiro and the Insurance Building. In any event such result did take place after Mr. Morris had operated Chiro for about five or six months. The purchase transaction was closed on January 1, 1955, and the purchaser of the Chiro stock was Morris Plan Life Insurance Company.

According to Mr. Morris the transaction was closed upon the following basis: cost to Morris Plan of all the Chiro stock and of the company in its entirety, with all indebtedness paid, would be $873,750.00. This would be accomplished by considering the outstanding indebtedness of $223,750.00 to be a deduction to be applied in favor of Morris Plan to the larger figure, so that aside from such indebtedness there would be a $650,000.00 balance to be paid to the defendants. Since the amount represented as indebtedness owing by Chiro to the defendants on the Insurance Building was considerably in excess thereof it was agreed by the defendants that the $750,-000.00 debt against said building would be reduced to the figure of $650,000.00, so that when the $223,750.00 in outstanding debts of Chiro were added thereto there would be accounting for the $873,750.00 cost price to Morris Plan. Of said $650,-000.00 which defendants were to receive as Net consideration Morris Plan agreed to pay and did pay the amount of $100,000.00 in cash. This left the balance owing the defendants for the stock of Chiro purchased from them the amount of $550,000.-

00, fully secured by their lien against the Insurance Building. This they had held from the time in 1953 when the building was sold to the "promoters" of Chiro. The defendants had, however, arranged with Morris Plan—pursuant to the transaction of sale and purchase of Chiro stock—to take Morris Plan's note as "in renewal and extension" of the note originally given by the "promoters". However the note balance was reduced so as to cause it to conform with the new balance of indebtedness: $550,000.00.

Pursuant to concluding the foregoing transaction the Insurance Building, in early 1955, stood as a part of the capital structure of Morris Plan at an "approved" valuation on the part of the Insurance Department of the State of Texas of $873,-750.00. However, within a few months the Texas Legislature amended Article 3.40, Texas Insurance Code, V.A.T.S., so that it provided that the Department could at "any time", upon examination of an insurance company, cause any investment of such company to be appraised at the expense of the company. In 1956 the Insurance Department conducted an examination of Morris Plan. Incident to such examination the examiner questioned the "value" of the Insurance Building. In consequence there was a reappraisal of the building in question for purpose of determining its proper monetary value as an investment under the code. Following and as a result of the reappraisal it was required that there be a reduction of what had been the $873,750.00 "approved" valuation of the Insurance Building (for Insurance Department purposes) to the amount of $700,000.-00, as "approved" valuation.

Coupled with additional reasons occasioning financial stress the reduction in the "approved" value of the Insurance Building, as a property of investment making up part of Morris Plan's capital, caused its "impairment" in that (as result thereof) there was an imbalance of the company's assets and liabilities. This meant that Morris Plan had a little less that three months within which to arrange affairs so that there would be an elimination of the "impairment", to the satisfaction of the Insurance Department. Should the company fail so to do, within the period allowed, it would be subject to forfeiture of its license to do business.

In correction of the "impairment" Garrett Morris borrowed from the defendants the sum of $150,000.00, giving his personal note secured by his stock in Morris Plan. This $150,000.00 he paid to defendants, in behalf of Morris Plan,—to be applied to reduce the indebtedness of that company's note. Such note was that for which the Insurance Building stood security. This transaction occurred in August of 1956. In substance this altered the consideration defendants were to receive for their Chiro stock pursuant to the transaction of January, 1955, to the following: $100,000.00 in cash received from Morris Plan; $150,-000.00 by way of credit on balance owing by Morris Plan because of payment by Garrett Morris; with balance owing of $400,000.00. Coupled therewith, of course, was a new $150,000.00 debt—on Garrett Morris' personal note—as security for which he had pledged his stock in Morris Plan.

About six years later, in 1962, the plaintiffs sought additional relief of the defendants. Mr. Morris, by a letter dated July 18, 1962, proposed that the defendants accept his personal note for an additional $200,000.00—to be credited on the Insurance Building note. Attempts to arrive at some agreement by the parties had not borne fruit as of August 3, 1962. On that date Mr. Morris—as for both plaintiffs—wrote a letter to defendants in which there was a claim of failure of consideration in the original purchase of the Chiro stock (in 1955), and requesting a reformation of contract(s) under some reasonable solution. Subsequently, on September 24, 1962, plaintiffs threatened "to bring suit for reformation of the entire agreement * * * unless we can get a substantial adjustment on the base note."

Later in 1962 the parties arrived at an agreement pursuant to which defendants accepted a surplus debenture from Morris Plan in the amount of $75,000.00, and credited the Insurance Building note with that amount. In connection therewith the defendants secured a release in writing from plaintiffs of "any and all claims or causes of action of any kind or character * * *."

Subsequently, in 1967, following fruitless attempts by the parties to resolve other and newly arisen problems occasioning requests by and in behalf of the plaintiffs for a renegotiation of times for and modes of making payment of the notes aforementioned, and/or refinancing in general, the plaintiffs instituted this suit. Cross-action by the defendants was to convert to judgment the respective indebtedness owing them by each of the plaintiffs, plus ancillary relief by way of foreclosure, etc.

When Morris Plan entered into the transaction with the defendants in 1955 there had been discussions during the course of which defendants had represented that as consideration for their original acquisition of the Insurance Building they had given or paid "in trade" the amount of $1,000,000.00. As heretofore indicated, the evidence relative to the transaction in question is conclusive that such representation was true and that such amount "in trade" was actually paid by defendants.

Even if that were not the case we do not think it a matter in doubt but that plaintiffs were not thereby induced to purchase the stock in Chiro, incidentally acquiring the Insurance Building. Disregarding the matter of plaintiffs' cost of acquisition, plaintiffs were fully informed that the amount the defendants would receive for the building, pursuant to the 1955 transaction, would only be $650,000.00, $550,000.00 of which would be by note. Defendants could have foreclosed against Chiro and acquired the Insurance Building free and clear of ($223,750.00) outstanding indebtedness of Chiro under their mortgage security. Such was within the plaintiffs' knowledge. Though it might be correct to say that plaintiffs paid more than $650,000.00 for the building it would nevertheless be correct to say that defendants received no more than this for the building *plus* their Chiro stock.

■ Since there was no issue raised on plaintiffs' actionable fraud theory, either in the 1953 transaction between defendants and the promoters or in the 1955 transaction between defendants and plaintiffs, the consideration for the notes upon which the defendants counterclaimed was unquestionably lawful, and there could have been no failure of (defendants') consideration either for the Insurance Building or for the Chiro stock.

■ Though we forego discussion we will add that even should we err in our holding, hereinabove, plaintiffs have estopped themselves upon a charge of fraud by their actions between 1956 and 1962 (in particular by the release transaction of 1962). See Champlin Oil & Refining Company v. Chastain, 403 S.W.2d 376, 385 (Tex.Sup., 1965).

■ Further discussion is warranted upon the contention of Garrett Morris that in any event he would not be liable for the payment of interest, as decreed by the judgment on his $150,000.00 personal note to the defendants, from August, 1962 (when interest thereon was last paid) and February, 1967, absent determination of fact issues by the jury.

This contention necessarily rests upon a forbidden consideration by the jury of evidence inhibited under the parol evidence rule. Without such consideration no fact issue could arise. Our conclusion, therefore, is that this point of error should be overruled.

All points of error have been considered and are severally overruled.

Judgment is affirmed.