COURT OF APPEALS
EIGHTH DISTRICT OF TEXAS
EL PASO, TEXAS

|  |  |  |
|---|---|---|
| MARTIN BROCK JONES, JR., | § | |
| Appellant, | § | No. 08-08-00245-CV |
| | § | |
| v. | § | Appeal from |
| | § | |
| J. CLEO THOMPSON A/K/A | § | 112th District Court |
| JAMES CLEO THOMPSON JR., | § | |
| INDIVIDUALLY AND AS | | of Crockett County, Texas |
| EXECUTOR OF THE ESTATE OF | § | |
| JAMES CLEO THOMPSON, AND | | (TC # 06-04-06853-CV) |
| J. CLEO THOMPSON AND | § | |
| JAMES CLEO THOMPSON, JR., | | |
| A PARTNERSHIP, | § | |
| | § | |
| Appellees. | § | |

## **O P I N I O N**

This appeal stems from the sale of a mineral interest in 1998. Strapped for cash, Appellant Martin Brock Jones, Jr. sold the interest for $55,000. Subsequent field development netted the purchasers revenues upwards of a million dollars. Simply stated, we must decide who knew what when. The trial court entered summary judgment in favor of the purchasers--James Cleo Thompson, Jr., individually and as executor of the estate of J. Cleo Thompson; J. Cleo Thompson and James Cleo Thompson Jr., a partnership; and J. Cleo Thompson and James Cleo Thompson, Jr., L.P., collectively Thompson.[1] For the reasons that follow, we affirm on limitations grounds.

---

[1] James Cleo Thompson, deceased, was the father of J. Cleo Thompson, Jr. The two were in partnership together when they first acquired the Bailey leases in the late 1960's. When the father died in 1975, Thompson Jr. operated the leases through a partnership known as J. Cleo Thomspon and James Cleo Thompson, Jr., a Partnership. The entity later became known as J. Cleo Thompson and James Cleo Thompson, Jr., L.P. We refer to the Appellees collectively as Thompson, because J. Cleo Thompson, Jr. acted both individually and through his partnerships and agents.

## FACTUAL BACKGROUND

### Jones Inherits the Mineral Interest

Jones' family owned mineral interests in the Bailey Estate Trust for decades. Jones grew up on a ranch in Ozona, Crockett County, Texas, which formed the 1761 acre surface estate. His mother, Bernice Jones, inherited the property from her parents, John and Roberta Bailey. When Bernice passed away in 1987, Jones inherited the surface and a 1/12 beneficial interest in the mineral estate. The trustees of the Bailey Estate Trust hold title to and administer the mineral interests located in Crockett County.

### The Role of J. Cleo Thompson, Jr.

J. Cleo Thompson, Jr. acquired a ranch in Crockett County in 1967. In 1969 or 1970, he purchased the majority working interest in the oil and gas leases in the Bailey Estate Trust and became the operator. By the time of the events giving rise to this litigation, Thompson had controlled production on the Bailey leases for 28 years, making all decisions regarding drilling and production. According to Jones, Thompson held himself out as the person the local residents could trust in oil and gas matters.

Thompson and Bernice Bailey Jones became close personal friends and remained so for many years. In 1983, Thompson, Bernice and several others formed the Crockett County National Bank. Thompson served as chairman of the board and principal shareholder. Jones testified that his mother held Thompson in high regard and placed a great deal of trust and confidence in him. Thompson reciprocated those feelings, and thought the world of Jones and his brother, John. In fact, when Bernice passed away, Thompson hired John as vice president of the Bank and asked him to assume Bernice's place on the Board of Directors.

### Jones' Relationship With the Bank

In February 1990, Jones borrowed $150,000 from the Bank to maintain his ranching operations. He pledged his interest in the surface and mineral estates as collateral. Over the years, the loan was extended and the balance grew. Jones assigned his royalty payments to service the debt, but in the end, they proved insufficient. In 1997, the Bank asked Jones to move his loan at the recommendation of bank examiners.[2] Finally, the Bank gave notice that it intended to call the note and proceed with foreclosure. By this time, Jones owed the Bank $220,000 and had no alternative financing arranged. At that point, he decided to sell the ranch.

Jones first asked his brother if he would be interested in buying the property, but John declined because he could not afford it. Jones then reached out to Thompson. He recalled Thompson saying that he would only be in interested in buying the ranch if he acquired the minerals with it. But before he could sell the mineral estate, Jones first had to offer it the trustees of the Bailey Estate Trust pursuant to the trust agreement. The trustees did not exercise their right of first refusal. Thompson told Jones that the mineral interest was worth $55,000.[3] Jones believed that to be a fair price and understood that any valuation would be based upon current production. The sale closed on April 29, 1998. For the most part, the litigants agree with the facts as we have stated them thus far.

### 1997 Texas Railroad Commission Filings

In July 1997, Thompson applied to amend the field rules for the Ozona NE. (Canyon 7520) Field (67998 500), Crockett County, Texas, to amend the well spacing of 1320'/2640' to 660'/1320'.

---

[2] Jones could not recall whether he spoke with the original loan officer, Drake McKinney, or Pon Seahorn.

[3] Eddie Ayers, a reservoir engineer who worked for Thompson, participated in valuing Jones' interest. Ayers projected revenues versus expense and discounted the revenue extreme to present value. Ayers frequently valued mineral interests for the Bank in connection with evaluating collateral for loan purposes.

The application was prepared by Thompson's petroleum engineer, Sol Smith. The purpose of the application was to "afford greater flexibility in locating wells on the most favorable geological location; thus recovering greater reserves and preventing waste." Smith also averred that, "[d]ue to the event of 3-D geological surveys, the best areas to drill are shown." Proper notice was given for a hearing on July 30, 1997. The application was unprotested and the technical hearings examiner recommended approval. In her findings of fact, the examiner recited that there were 68 producing wells in the field, 56 of which were operated by Thompson. Of Thompson's 56 wells, 29 were Bailey wells.[4] In Findings of Fact 4 and 5, the examiner found that:

4. Thompson plans to drill at least 15 wells under the optional 160 acre optional rule. Many of the proposed locations, identified from 3-D seismic, would require exceptions to Rule 37 under the existing spacing rules.[5]

5. The proposed spacing rule will allow additional wells to be drilled without the time and additional cost associated with obtaining rule 37 exceptions.

In Conclusion of Law 3, she found that amending the field rules would provide for effective and efficient field development. The Commission signed a final order approving the application on August 26, and it became final on September 19, 1997. Despite the changes in the permit and the abundant reserves, Thompson did not drill any new wells.

## Development of the Reserves

---

[4] We have obtained these calculations from the July 1997 Gas Proration Schedule which Thompson attached as an exhibit to the application. According to the affidavit of one of the petroleum engineering witnesses, proration schedules identify every well in each oil and gas field designated by the Commission.

[5] Thompson testified that the 3-D geological surveys were not performed until after the farm out agreement with Approach. He disputed Smith's statement that "[d]ue to the event of 3-D geological surveys, the best areas to drill are shown." He also denied any plan to drill fifteen wells. Thompson's chief financial officer, Cliff Milford, thought the application contained a simple grammatical error: it should have read "[d]ue to the *advent of*" rather than "[d]ue to the *event of*" 3-D geological surveys. Milford also took issue with the examiner's finding that Thompson was going to drill fifteen wells. "There was no plan to drill."

In November 2003, Thompson was contacted by Approach Resources, Inc. about taking a farm out agreement on leases held by Thompson. Beginning in 2004, Approach drilled numerous wells under the farm out agreement, beginning on the Bailey leases.[6] James Dalby, Thompson's drilling superintendent, believed Approach drilled more than 100 wells on the Bailey leases. It surprised him because Approach was "pretty aggressive" and drilling "didn't fit with the program that [he] was used to," particularly since Thompson had not drilled on the Bailey since 1987.

Charles Graham, a petroleum engineer, was employed as Jones' expert witness. In his affidavit he explained that the Bailey leases were situated in the Ozona NE. (Canyon 7520) Field and were producing natural gas in paying quantities. He offered his opinions on the extent of undeveloped hydrocarbon reserves in the Canyon sand reservoirs underlying the Bailey leases as of April 29, 1998. Technical evidence revealed that the existing wells could not recover the reserves underlying the proration units assigned. Documents on file with the Commission supported his conclusions as to the undeveloped reserves. But Thompson did not drill on the Bailey leases in 1998, 1999, 2000, 2001, 2002 or 2003. In Graham's opinion, Thompson knew of significant undeveloped hydrocarbon reserves under the Bailey leases when he bought Jones' mineral interest.

Graham then measured Jones' damages. When Approach drilled the reserves, Thompson received royalties of $1,600,786 which were solely attributable to the interest purchased from Jones. Graham calculated the present value of future royalties to be $1,360,979.

**The Lawsuit**

Jones filed suit against Thompson on April 18, 2006. The causes of action included breach of fiduciary duty; common law fraud (fraudulent misrepresentation and/or fraudulent inducement);

---

[6] Thompson testified that when Approach started drilling, they started on the Bailey and Clayton leases. His chief financial officer, Cliff Milford, disagreed.

fraud by non-disclosure; fraud under Texas Business & Commerce Code, Section 27.01; money had and/or received; and constructive fraud. Thompson filed motions for traditional and no-evidence summary judgment alleging, among other grounds, that the suit was barred by limitations. On June 27, 2008, the trial court granted summary without specifying its reasons.

## Issues on Appeal

Jones challenges the summary judgment in nine points of error. With regard to the statute of limitations, he contends that both the discovery rule and the doctrine of fraudulent concealment tolled limitations and that Thompson failed to prove when he knew or should have known of his injuries.

## LIMITATIONS

*Standard of Review*

The standard of review for traditional summary judgment under TEX.R.CIV.P. 166a(c) is well established. *Nixon v. Mr. Property Management Company, Inc.*, 690 S.W.2d 546, 548 (Tex. 1985). The moving party carries the burden of showing there is no genuine issue of material fact and it is entitled to judgment as a matter of law. *Browning v. Prostok*, 165 S.W.3d 336, 344 (Tex. 2005); *Duran v. Furr's Supermarkets, Inc.*, 921 S.W.2d 778, 784 (Tex.App.--El Paso 1996, writ denied). Evidence favorable to the non-movant will be taken as true in deciding whether there is a disputed issue of material fact. *Fort Worth Osteopathic Hospital, Inc. v. Reese*, 148 S.W.3d 94, 99 (Tex. 2004); *Duran*, 921 S.W.2d at 784. All reasonable inferences, including any doubts, must be resolved in favor of the non-movant. *Id*. A defendant is entitled to summary judgment if the evidence disproves as a matter of law at least one element of each of the plaintiff's causes of action or if it conclusively establishes all elements of an affirmative defense. *Randall's Food Markets, Inc. v. Johnson*, 891 S.W.2d 640, 644 (Tex. 1995). Once the defendant establishes a right to summary

judgment as a matter of law, the burden shifts to the plaintiff to present evidence raising a genuine issue of material fact. *Scown v. Neie*, 225 S.W.3d 303, 307 (Tex.App.--El Paso 2006, pet. denied). When the trial court's judgment does not specify the ground, or grounds, upon which it relied for its ruling, the judgment must be affirmed if any of the theories advanced are meritorious. *Carr v. Brasher*, 776 S.W.2d 567, 569 (Tex. 1989); *Fertic v. Spencer*, 247 S.W.3d 242, 249 (Tex.App.--El Paso 2007, pet. denied).

When reviewing a no-evidence motion for summary judgment, we must disregard all contrary evidence and inferences, and review the evidence in the light most favorable to the non-movant. *King Ranch, Inc. v. Chapman*, 118 S.W.3d 742, 751 (Tex. 2003). Once the moving party specifically states the elements as to which there is no evidence, the burden shifts to the non-movant to produce summary judgment evidence raising a genuine issue of material fact regarding each element challenged. *Gray v. Woodville Health Care Center*, 225 S.W.3d 613, 616 (Tex.App.--El Paso 2006, pet. denied). If the non-movant produces more than a scintilla of evidence regarding the challenged element, a genuine issue of material fact is raised. *Id*. Less than a scintilla of evidence exists if the evidence is so weak as to create no more than a mere surmise or suspicion. *King Ranch, Inc*., 118 S.W.3d at 751. However, when the evidence rises to a level that enables reasonable minds to differ in their conclusions, then more than a scintilla of evidence exists. *Id*. If the non-movant does not produce more than a scintilla of evidence to raise a genuine issue of material fact, the trial court "must" grant the motion. *Larned v. Gateway East, Inc*., 186 S.W.3d 597, 601 (Tex.App.-- El Paso 2006, no pet.); *see also* TEX.R.CIV.P. 166a(i).

A defendant moving for summary judgment on the affirmative defense of limitations has the burden to conclusively establish that defense. *University of Houston v. Clark*, 38 S.W.3d 578, 580 (Tex. 2000); *KPMG Peat Marwick v. Harrison County Housing Finance Corporation*, 988 S.W.2d

746, 748 (Tex. 1999). The defendant must (1) conclusively prove when the cause of action accrued, and (2) negate the discovery rule, if it applies and has been pled or otherwise raised, by proving as a matter of law that there is no genuine issue of material fact about when the plaintiff discovered, or in the exercise of reasonable diligence should have discovered, the nature of its injury. *KPMG Peat Marwick*, 988 S.W.2d at 748. If the movant establishes that the statute of limitations bars the action, the non-movant must then adduce summary judgment proof raising a fact issue in avoidance of the statute of limitations. *Id*.

## The Parties' Positions

Jones's causes of action against Thompson stemmed from claims of breach of fiduciary duty and fraud. The longest limitations period afforded to any of his claims is four years. *See* TEX.CIV.PRAC.&REM.CODE ANN. § 16.004 (Vernon 2002). Ordinarily, the statute of limitations begins to run when a particular cause of action accrues. *S.V. v. R.V.*, 933 S.W.2d 1, 4 (Tex. 1996); *Fraga v. Drake*, 276 S.W.3d 55 (Tex.App.--El Paso 2008, no pet.). A cause of action generally accrues when a wrongful act causes a legal injury regardless of when the plaintiff discovers the injury or if all resulting damages have not yet occurred. *Childs v. Haussecker*, 974 S.W.2d 31, 36 (Tex. 1998). Thompson argues that the legal injury of which Jones complains is the sale of the mineral interest. He maintains he conclusively established that Jones' claims all accrued no later than the date of sale--April 29, 1998--such that the April 16, 2006 lawsuit was barred by limitations. Jones counters that both the discovery rule and the doctrine of fraudulent concealment deferred the accrual of his causes of action until July of 2004, when Approach Resources Inc. began producing large quantities of minerals on the property.

## The Discovery Rule

In those rare cases when the nature of the injury incurred is inherently undiscoverable and

the evidence of injury is objectively verifiable, the Texas Supreme Court applies a judicially crafted exception to the general rule of accrual, known as the discovery rule. *Computer Assocs. Int'l, Inc. v. Altai, Inc.*, 918 S.W.2d 453, 456 (Tex. 1996). Under this rule, a cause of action does not accrue until a plaintiff knows or, through the exercise of reasonable care and diligence, should have known of the wrongful act and resulting injury. *S.V.*, 933 S.W.2d at 4, *citing Trinity River Auth. v. URS Consultants, Inc.*, 889 S.W.2d 259, 262 (Tex. 1994). Once these requirements are satisfied, limitations commence even if the plaintiff does not know the exact identity of the wrongdoer. *See, e.g., Russell v. Ingersoll-Rand Co.*, 841 S.W.2d 343, 344 n.3 (Tex. 1992); *Moreno v. Sterling Drug, Inc.*, 787 S.W.2d 348, 351 (Tex. 1990).

Thompson argues that the discovery rule does not apply to this lawsuit because fraud claims are governed by the separate and distinct doctrine of fraudulent concealment. *S.V.*, 933 S.W.3d at 4; *Wagner & Brown, Ltd. v. Horwood*, 58 S.W.3d 732, 736 (Tex. 2001). In response, Jones directs us to *Murphy v. Campbell* to support its argument that the discovery rule applies to his fraud claims. 964 S.W.2d 265, 270 (Tex. 1997). In *Murphy*, the court stated:

> We have not applied [the legal injury] rule without exception, however, and have sometimes held that an action does not accrue until the plaintiff knew or in the exercise of reasonable diligence should have known of the wrongful act and resulting injury. *S.V.*, 933 S.W.2d at 4. This exception, which we call the 'discovery rule', applies in cases of fraud and fraudulent concealment, and in other cases in which 'the nature of the injury incurred is inherently undiscoverable and the evidence of injury is objectively verifiable.' *Computer Assoc. Int'l, Inc. v. Altai, Inc.*, 918 S.W.2d 453, 456 (Tex. 1996); *S.V.*, 933 S.W.2d at 6.

*Id*. at 270. The Fourth Court of Appeals followed *Murphy* in *BP America Production Co. v. Marshall*, 288 S.W.3d 430, 452 (Tex.App.--San Antonio 2008, pet. filed). We agree with Jones that the holding in *Wagner* does not expressly overrule the holding in *Murphy*.

Thompson had the burden to prove as a matter of law that there is no genuine issue of

material fact about when plaintiff discovered, or in the exercise of reasonable diligence should have discovered, the nature of the injury. *KPMG Peat Marwick*, 988 S.W.2d at 748. If Thompson established that the statute of limitations bars the action, then Jones was required to adduce summary judgment proof raising a fact issue in avoidance. *Id*.

The discovery rule only applies when the nature of the plaintiff's injury is both inherently undiscoverable and objectively verifiable. *Computer Assocs. Int'l, Inc.*, 918 S.W.2d at 456. An injury is inherently undiscoverable if it is, by its nature, unlikely to be discovered within the prescribed limitations period despite due diligence. *S.V.*, 933 S.W.2d at 7. "Inherently undiscoverable" does not mean that a particular plaintiff did not discover his or her particular injury within the applicable limitations period. *Id*. Instead, we determine whether an injury is inherently undiscoverable on a categorical basis because such an approach "brings predictability and consistency to the jurisprudence." *Apex Towing Co. v. Tolin*, 41 S.W.3d 118, 122 (Tex. 2001), *citing S.V. v. R.V.*, 933 S.W.2d at 6; *see also HECI Exploration Co. v. Neel*, 982 S.W.2d 881, 886 (Tex. 1998).

In *HECI*, the plaintiffs were members of the Neel family who owned royalty interests under an oil and gas lease. 982 S.W.2d 881, 884 (Tex. 1998). The lessee and operator, HECI Exploration Company, discovered that AOP, a producer on an adjoining lease, had damaged the common reservoir by overproduction. *Id*. HECI sued AOP in 1988, and obtained monetary and injunctive relief in the trial court. *Id*. HECI and AOP eventually settled the suit and filed a release of judgment. *Id*. The Neels sued HECI in 1993, more than four years after damage to the reservoir had occurred. *Id*. Among other things, they alleged that HECI violated an implied covenant to notify them of the need to sue AOP. The court assumed without deciding that such an implied covenant exists, but held that the statute of limitations barred the claim. *Id*. at 888.

As owners of an interest in the mineral estate, the Neels had some obligation to exercise reasonable diligence in protecting their interests. This includes exercising reasonable diligence in determining whether adjoining operators have inflicted damage. Royalty owners cannot be oblivious to the existence of other operators in the area or the existence of a common reservoir. In some cases, wells visible on neighboring properties may put royalty owners on inquiry. In any event, a royalty owner should determine whether a common reservoir underlies its lease because it knows or should know that, when there are other wells drilled in the reservoir, there is the potential for drainage or damage to the reservoir.

*Id*. at 886. The court emphasized that several sources of information about the existence of a common reservoir and operations within it were available to the royalty owners, including Texas Railroad Commission and lessee records. *Id*. at 886-87. The court held that because damage to the common reservoir was not inherently undiscoverable, the lessee's failure to notify the Neels of their potential claims did not toll limitations. *Id*. at 887.

The court applied *HECI* in *Wagner*, 58 S.W.3d at 732. There, royalty owners brought claims against a lessee for the underpayment of royalties as a result of the lessee's allegedly improper post-production charges that appeared on royalty statements provided to the owners. *Id*. at 736-37. In determining the applicability of the discovery rule, the supreme court noted that royalty owners have some obligation to exercise reasonable diligence in protecting their interests. This includes the need to exercise due diligence in enforcing contractual rights, in determining whether charges are proper and reasonable, and in determining whether to perform additional investigation to protect their interests. *Id*. at 735-36. Royalty owners may seek information necessary to assess the propriety of royalty calculations from the lessee and other sources. *Id*. at 737. They could have sought information about the improper post-production charges from the lessee and from the gas purchasers. *Id*. Because the underpayments could have been discovered with the exercise of reasonable diligence, the royalty owners' injury was not inherently undiscoverable and, thus, the discovery rule did not apply. *Id*.

The record here contains the affidavits of two petroleum engineers. Tim Smith explained that when analyzing and evaluating mineral interests, petroleum engineers often refer to and rely on information that is commercially available, including the Texas Railroad Commission records. The types of information available from the Commission in 1998 included its Mapping Information Management System (MIMS) and associated quad reports, potential files, hearing files, proration schedules, production information, and in some cases well logs. The affidavit of Charles Graham, Jones' expert witness, opined that Commission files in existence prior to 1998 revealed that Thompson should have already engaged in additional development of the Bailey leases. Even a cursory review of the 1997 application would have revealed the possibility that significant reserves existed on the Bailey leases in the Ozona NE. (Canyon 7520) Field because the Gas Proration Schedule listed them. And regardless of whether Thompson later denied that he planned to drill fifteen wells, a prudent mineral interest owner would certainly have reason to inquire about future production based on Sol Smith's representations in the application. Because Jones' injury was not inherently undiscoverable, the discovery rule does not toll limitations.[7]

## Fraudulent Concealment

Fraudulent concealment works to estop a defendant from asserting limitations as a defense because "a person cannot be permitted to avoid liability for his actions by deceitfully concealing wrongdoing until limitations has run." *S.V.*, 933 S.W.2d at 6. Fraudulent concealment tolls the statute of limitations until the injured party, using reasonable diligence, discovered or should have discovered the injury. *KPMG Peat Marwick*, 988 S.W.2d at 750. The elements of fraudulent concealment are (1) the existence of the underlying tort; (2) the defendant's knowledge of the tort;

---

[7] Because we conclude that the injury was not inherently undiscoverable, we need not consider whether it is objectively verifiable. *Wagner*, 58 S.W.3d at 737.

(3) the defendant's use of deception to conceal the tort; and (4) the plaintiff's reasonable reliance on the deception. *Glover v. Union Pacific Railroad Co.*, 187 S.W.3d 201, 217 (Tex.App.--Texarkana 2006, pet. denied); *Mitchell Energy Corp. v. Bartlett*, 958 S.W.2d 430, 439 (Tex.App.--Fort Worth 1997, pet. denied). A party asserting fraudulent concealment as an affirmative defense to the statute of limitations has the burden to raise it in response to the summary judgment motion and to come forward with summary judgment evidence raising a fact issue with regard to each of the four elements. *KPMG Peat Marwick*, 988 S.W.2d at 748.

*Does A Fiduciary Duty Exist?*

We begin with the existence of the underlying tort. Jones' claims include torts related to fraud and breach of fiduciary duty. He contends that he had an informal and confidential relationship with Thompson that gives rise to a fiduciary duty. First, he emphasizes that Thompson was aware of Jones's financial hardships due to his position as chairman of the board at the Bank and his position on the Bank loan committee. Thompson was also in a unique position of control through his status as operator of the mineral leases. Finally, Thompson maintained a close and confidential relationship with Jones' mother, Bernice. Jones concedes that any one of these positions taken alone would not give rise to a fiduciary duty, but taken together they create a fact issue as to the existence of a fiduciary duty.

Texas courts are reluctant to recognize informal fiduciary relationships. *Schlumberger Tech. Corp. v. Swanson*, 959 S.W.2d 171, 177 (Tex. 1997). Mere subjective trust does not transform an arms-length transaction into a fiduciary relationship. *Id.* Before such a duty is imposed in a business context, the special relationship of trust and confidence must exist prior to, and apart from, the agreement made the basis of the suit. *Associated Indem. Corp. v. CAT Contracting, Inc.*, 964 S.W.2d 276, 288 (Tex. 1998). Admittedly, Jones had not sought Thompson's financial advice before the sale. And regardless of Thompson's positions at the Bank, no fiduciary relationship exists between a lender and a borrower. *Wil-Roye Inv. Co. II v. Washington Mut. Bank, FA*, 142 S.W.3d 393 (Tex.App.--El Paso 2004, no pet.); *Manufacturers Hanover Trust Co. v. Kingston Investors Corp.*, 819 S.W.2d 607, 610 (Tex.App.--Houston [1st Dist.] 1991, no writ). Nor can Jones rely upon Thompson's status as operator of the leases. Texas law has not recognized a fiduciary relationship between a lessee and a royalty owner. *HECI*, 982 S.W.2d at 888. The Supreme Court has also rejected Jones' claim that Thompson's duty to develop the Bailey leases gives rise to a fiduciary

relationship. *In re Bass*, 113 S.W.3d 735, 743 (Tex. 2003). The duty to develop a mineral lease arises from the implied covenant doctrine of contract law, not from a fiduciary duty arising out of agency law.[8] *Id.* Finally, Jones cannot rely on Thompson's long-standing friendship with Bernice. Jones testified that Thompson was more than an acquaintance but less than a close personal friend. It was not uncommon for years to pass without conversations between the two. In fact, he could not recall speaking to Thompson at any time between 1990 and 1998. Even a cordial friendship involving regular social engagements is not evidence of a confidential relationship. *Meyer v. Cathey*, 167 S.W.3d 327, 330-31 (Tex. 2005). For all of these reasons, we conclude that Jones has not raised a fact issue as to the existence of a fiduciary duty.

*Fraud*

Because Jones has not established the existence of a confidential or fiduciary relationship, his claims of constructive fraud[9] and fraud by nondisclosure[10] must fail. To establish common law fraud, Jones must demonstrate that: (1) Thompson made a material and false representation of fact; (2) Thompson made the representation knowing it to be false or made it recklessly as a positive assertion without any knowledge of its truth; (3) Thompson intended for Jones to act upon the representation; (4) Jones acted in reliance upon the representation and suffered injury as a result. *Eagle Properties, Ltd. v. Scharbauer*, 807 S.W.2d 714, 723 (Tex. 1990)*; Brush v. Reata Oil & Gas*

---

[8] We note here that Jones has filed a separate lawsuit concerning Thompson's breach of the duty to develop the Bailey leases. The reasons why Thompson did not drill between 1987 and 2004 are more appropriately addressed there.

[9] Constructive fraud is the breach of a legal or equitable duty which the law declares fraudulent because it violates a fiduciary or confidential relationship. *See Texas Integrated Conveyor Systems, Inc. v. Innovative Conveyor Concepts, Inc.*, 300 S.W.3d 348 (Tex.App.--Dallas 2009, pet. denied).

[10] The failure to disclose information is not actionable unless there is a duty to speak. *Bradford v. Vento*, 48 S.W.3d 749, 755 (Tex. 2001). Having found no fiduciary relationship, we conclude that Thompson had no duty to speak. Jones does not suggest that Thompson made a partial disclosure that required him to make full disclosure.

*Corp.*, 984 S.W.2d 720, 726 (Tex.App.--Waco 1998, pet. denied). The elements of statutory fraud are essentially the same except that Jones was not required to prove evidence of knowledge or recklessness. TEX.BUS.&COMM.CODE ANN. § 27.01 (Vernon 2009).

Jones alleged two misrepresentations--first, that Thompson, either individually or by or through his agent, misrepresented that Thompson would engage in no further development on the Bailey leases and would continue to hold those properties based on existing production; second, that Thompson misrepresented the value of Jones' mineral interest. The first claim relates to a purported conversation between Jones and Thompson's drilling superintendent, James Dalby. Jones asked Dalby whether any more wells were going to be drilled on the Bailey. Dalby replied that to his knowledge, there were no plans for the Thompson entities to do any further development. In his deposition, Dalby did not recall ever discussing future drilling with Jones. Drilling decisions were made by Thompson alone. Dalby's only decision-making related to whether a specific location was advantageous with respect to terrain. More importantly, however, Jones chronologically placed this conversation shortly after his mother's death in 1987, some eleven years before the sale to Thompson. At the very least, this is no evidence of the third and fourth elements.

The second claim is that Thompson misrepresented the value of the mineral interest. An actionable representation is one concerning a material fact; a pure expression of opinion will not support an action for fraud. *Trenholm v. Ratcliff*, 646 S.W.2d 927, 930 (Tex. 1983). An expression of opinion about monetary value is not a representation of fact which gives rise to an action for fraud. *See McCollum v. P/S Investments, Ltd.*, 764 S.W.2d 252, 254 (Tex.App.--Dallas 1988, writ denied); *Cravens v. Skinner*, 626 S.W.2d 173, 177 (Tex.App.--Fort Worth 1981, no writ); *Morris v. Leonard*, 441 S.W.2d 877, 881 (Tex.Civ.App.--Fort Worth 1969, writ ref'd n.r.e.), *cert. denied*, 402 U.S. 974, 91 S.Ct. 1667, 29 L.Ed.2d 139 (1971). Whether a statement is an actionable statement of "fact" or

merely one of "opinion" often depends on the circumstances in which a statement is made. Among the relevant circumstances are the statement's specificity, the speaker's knowledge, the comparative levels of the speaker's and the listener's knowledge, and whether the statement relates to the present or the future. *See Trenholm*, 646 S.W.2d at 930; *Safety Cas. Co. v. McGee*, 133 Tex. 233, 127 S.W.2d 176, 178 (1939); *Angelo Broadcasting, Inc. v. Satellite Music Network, Inc.*, 836 S.W.2d 726, 733 (Tex.App.--Dallas 1992, writ denied), *disapproved on other grounds by Hines v. Hash*, 843 S.W.2d 464, 469-70 (Tex. 1992). A statement of value may be actionable if the speaker knows it to be false. *Texas Indus. Trust, Inc. v. Lusk*, 312 S.W.2d 324, 326 (Tex.Civ.App.--San Antonio 1958, writ ref'd).

Thompson made an offer to buy for $55,000. Jones admitted that Thompson's value was approximately the value the Bank had accepted when Jones submitted financial documentation in support of his loan application. Jones believed it to be a fair price and in the "[b]allpark." He conducted his own independent valuation of the minerals and "compared the offer of the minerals to what I had valued those assets at, plus, you know, monthly runs against X number of months like you do." Thompson's offer exceeded the value placed upon Jones' share of Bernice's undivided one-quarter mineral interest at the time of her death.[11] We reject the theory that a purchaser can be liable for fraud if he offers a price below market value and the seller chooses to accept the offer. *See Marburger v. Seminole Pipeline Co.,* 957 S.W.2d 82, 87 (Tex.App.--Houston [14th Dist.] 1997, pet. denied).

Jones further claims that Thompson had special and superior knowledge when he made the offer. But the affidavits of Smith and Graham show that information concerning future drilling

---

[11] Bernice's one-quarter interest was valued at $126,000 at the time of probate in 1987. Jones' 1/12 interest would thus be worth $42,000 as of that date. Thompson paid $55,000 eleven years later although additional drilling had not occurred.

operations was readily available to Jones from the Commission records. The comparative levels of Thompson's and Jones' knowledge could not have been disproportionate because Jones had a duty to exercise reasonable diligence in valuing his own mineral interests.

We conclude that Thompson's offer was a pure expression of his own opinion and does not support a claim for fraud. Without a showing that the purchase of the mineral interest was somehow fraudulent or unjust, Jones' equitable claim for monies had and received likewise fails. Since the record does not support the existence of an underlying tort, the doctrine of fraudulent concealment does not apply. The accrual of Jones' claims was not deferred and the claims are barred by the statute of limitations. We affirm the summary judgment on limitations grounds. Our disposition of the first three points of error render it unnecessary for us to consider the remainder.

August 11, 2010

ANN CRAWFORD McCLURE, Justice

Before Chew, C.J., McClure, and Rivera, JJ.