COURT OF APPEALS
 SECOND DISTRICT OF TEXAS
 FORT WORTH
 
 




 

 

NO. 02-09-00249-CV

 

 




 
 
 ELIZABETH ANN LINDLEY, NOT INDIVIDUALLY, BUT SOLELY IN HER
 CAPACITY AS INDEPENDENT EXECUTOR OF THE ESTATE OF NAN DAWS, DECEASED
 
 
  
 
 
 APPELLANT
 
 




                                                                                                                             

V.

 




 
 
 J. ROSS MCKNIGHT,
 PAUL COWAN, PRYOR COWAN, JEFF M. GLAZNER, JANICE A. GLAZNER, JOHN E. GRAY,
 RAELYNN GRAY, WILLIAM T. HANNIS, KOBYE HANNIS, SCOTT HARRIS, LINDA HARRIS,
 WILLIAM H. HENSON, DEE ANN HENSON, EDWIN M. HINSON, SUSAN K. HINSON, JACK B.
 HORNE, CAROLE HORNE, PASCAL J. HOSCH, JOYCE HOSCH, LARRY O. HULSEY, GAYLE
 HULSEY, DONALD R. JOHNSTON, TERESA JOHNSTON, BOBBY KING, SUE KING, MARK
 MARTIN, CONNIE MARTIN, ROBERTA MONDEN, MIKE MONDEN, JAMES B. MYERS, LEANN
 MYERS, MIKE PARRACK, DORENE PARRACK, CHARLES PRIBYLA, MONA PRIBYLA, GENEVA C.
 RODGERS, SCOTT W. SEWELL, GINA E. SEWELL, TOMMY SLOAN, SUSAN SLOAN, BILL
 SNEED, VIRGINIA SNEED, TED TAYLOR, SONJA TAYLOR, JAMES SLOAN THOMPSON, DIANE
 THOMPSON, ALLEN E. TURNER, NAVALLEVE TURNER, JAMES BRUCE WATERFIELD, SANDRA
 WATERFIELD, DAVID A. WATSON, BETTY J. WATSON, THROCKMORTON BANCSHARES, INC.,
 OLNEY BANCSHARES OF TEXAS, INC., BRYAN ROBERTSON KEY, CANDYCE CAYE KEY, JOE
 MICHAEL BELLAH, ELIZABETH BROWN BELLAH, DONNELL THOMAS BROWN, KELLI EVANS
 BROWN, TODD CHARLES MCCARTNEY, MARIANNE BROWN MCCARTNEY, R. A. BROWN, JR.,
 PEGGY DONNELL BROWN, ROBERT ALFRED BROWN, TALLEY BROWN, A. DONALD CHANDLER,
 JOY CORNELIUS CHANDLER, J. M. CHANDLER, MARY GENE CHANDLER, JOHN TARKINGTON
 SCHRAMPFER, LEREY DAWS COKER SCHRAMPFER, NEL REY DAWS COKER, STANTON DOW
 LILES, III, GRETA NELSON LILES, BILLIE GASKINS MCKNIGHT, WILMA OPGENORTH
 MCKNIGHT, TERRELL CONDRON REDWINE, BETTYE G. REDWINE, RONNIE DUANE CAPPS,
 TRUDY CAPPS, MARK MCCLELLAND, GAY L. MCCLELLAND, JIM MYERS, LEMUEL KYLE
 YEATES, DEBORAH LYNN SHELLEY, TOMMY BOYD, LADELL BOYD, DON ROSS COMPTON, AND
 MARGIE COMPTON
 
 
  
 
 
 APPELLEES
 
 




 

                                                                                                                             

------------

 

FROM THE
30TH DISTRICT COURT OF WICHITA COUNTY

 

------------

 

OPINION

 

------------

          In five issues, appellant Elizabeth Ann
Lindley, not individually, but solely in her capacity as independent executor
of the estate of Nan Daws, deceased (Lindley), appeals the trial court’s final
judgment in favor of appellees J. Ross McKnight, Throckmorton Bancshares, Inc.
(Throckmorton), Olney Bancshares of Texas, Inc. (Olney), and the remaining
appellees listed above.  Lindley contends that the trial court erred by denying
her motion for summary judgment, granting appellees’ motions for summary
judgment, making allegedly incorrect rulings on the parties’ objections to
summary judgment evidence, and awarding more than $200,000 in attorney’s fees
to appellees.  We affirm.

Background Facts

          Throckmorton and Olney are holding companies
that purchase and own affiliated or unaffiliated banks.  McKnight is the
chairman of the board and president of Throckmorton, and he is the president of
Olney.  He owns stock in both corporations.  Daws
was one of the initial shareholders of Olney (investing $25,000), which was
formed to acquire the First National Bank of Olney and later acquired seven
other banks.  She also owned significant stock in Throckmorton, which owns only
the First National Bank of Throckmorton.  Lindley is Daws’s niece.

          McKnight and Daws are distant relatives.  Daws’s
husband, Jim Bob, was once the chairman of the First National Bank of
Throckmorton.  McKnight has lived in the city of Throckmorton his entire life
except when he attended college.  He was raised next door to the Dawses and
lived close to them until he went to college.  He considered them to be friends.

          In 1996, Throckmorton and Olney considered
conversions to S corporations.[1] 
In November of that year, McKnight sent a letter to Olney’s shareholders
stating that to complete the conversion, they needed to all agree to it through
an IRS election form and a shareholders’ agreement.

          The Throckmorton shareholders’ agreement,
which was revised and approved by the corporation’s attorney, Richard Dale
Craig, contains the following provisions, among others:

SHAREHOLDERS
AGREEMENT

          THIS AGREEMENT made effective
the 1st day of January, 1997, by and among Throckmorton Bancshares, Inc., a
Texas corporation (the “Corporation”) and the undersigned shareholders of the
Corporation and their respective spouses (the “Original Shareholders”).

          . . . .

          WHEREAS, the Corporation intends
to file an election to be taxed as an S corporation under the Internal Revenue
Code of 1986, as amended with the consent of the Original Shareholders; and

          WHEREAS, the Original Shareholders,
acting for themselves and for all persons who subsequently may become
shareholders of the Corporation (the “Shareholders”), and the Corporation wish
to keep the election in force until it is revoked pursuant to this Agreement. 

          NOW, THEREFORE, the Original
Shareholders and the Corporation agree as follows:

          Section 1.  Voluntary
Transfer of Stock.  No Shareholder shall transfer stock of the Corporation
by sale, gift, assignment, pledge, or other voluntary disposition or
encumbrance unless he shall have provided the Corporation, at least thirty (30)
days prior to the proposed transfer, with a written statement (the “Notice”)
regarding the identity of the proposed transferee sufficient to satisfy the
Corporation that (a) the proposed transferee is an eligible S corporation
shareholder and (b) the proposed transfer will not cause the record number of
Shareholders of the Corporation to exceed thirty-two (32).  Such proposed
transfer may be effected by the Shareholder only if the Corporation approves
the transfer in accordance with Section 3 below.  Any transfer of stock of the
Corporation that is not described in this Section 1 as a voluntary transfer
shall be considered an involuntary transfer subject to the provisions of
Section 2 below.

          Section 2.  Involuntary
Transfer of Stock.   In the event any Shareholder:

          (a) dies;

          . . . .

and, as a result of such event, the stock
of the Corporation owned by that Shareholder is subject to being transferred, .
. . the Shareholder shall be deemed, when the identity of the proposed
transferee is established, to have given Notice, as defined under Section 1
hereof, except that the Corporation shall not be deemed to have received such
Notice until the Corporation has actual knowledge of the event and the identity
of the proposed transferee.

          Section 3.  Approval by the
Corporation.  Within twenty (20) days of the receipt of a Notice required
by Section 1 hereof, the Corporation shall advise the Shareholder who provided
the Notice whether the Corporation approves the transfer.  The Corporation may,
in its sole discretion, approve or disapprove any proposed transfer, except
that the Corporation shall withhold its approval of any proposed transfer if
(a) it would cause or reasonably could cause the Corporation’s S status to
terminate or (b) it would cause the record number of Shareholders of the
Corporation to exceed thirty-two (32).[[2]]

          Section 4.  Effect of
Noncompliance.  In the event of any purported or attempted transfer of
stock that does not comply with the provisions of this agreement, the purported
transfer shall be void and the purported transferee shall not be deemed to be a
Shareholder of the Corporation and shall not be entitled to receive a new stock
certificate or any dividends or other distributions on or with respect to the
stock.

          Section 5.  Redemption of
Shares.  If a Shareholder attempts to transfer stock of the Corporation in
a manner that does not comply with the provisions of this Agreement, the shares
purported to be transferred shall, at the Corporation’s option, be deemed to be
redeemed immediately before the occurrence of the attempted transfer.  If the
Corporation exercises its option to redeem shares, the amount to be paid
therefor shall be their book value . . . as of the end of the fiscal year
immediately preceding the redemption . . . , which amount shall be payable in
cash.[[3]]

          Daws signed both corporations’ shareholders’
agreements.  McKnight asserted through an affidavit that the goals of the transfer
restrictions were to protect the corporations’ anticipated Subchapter S status,
minimize franchise taxes, promote ownership by shareholders who contributed to
the success of the banks owned by the corporations “in some way other than
indirect ownership,” and comply with various “federal and state banking
requirements, which may from time to time affect bank ownership.”[4]

          All of the corporations’ shareholders had to
consent to Subchapter S status for the conversions to occur.[5] 
Craig explained that new legislation had been passed that permitted financial
institutions to become S corporations effective in 1997.  He also said that a
corporation could not qualify for Subchapter S status if it had more than
seventy-five shareholders.[6] 
Craig conceded that federal law does not require S corporations to have
shareholders’ agreements.  He explained, however, that such agreements are
helpful to protect Subchapter S status because the agreements may prevent
shareholders from exceeding seventy-five or from transferring stock to an
impermissible shareholder, such as another corporation.  Craig said,

          It’s extremely easy to have an
inadvertent termination of an S election.  And one of the reasons that you
have a shareholders[’] agreement is to help put you in the best position to
argue with the IRS that there wasn’t an impermissible transfer, that there are
contractual restrictions that prevent that. . . .

          . . .  [I]t’s never a position
that one wants to be in to ask for forgiveness from the IRS.

          Daws died on June 25, 2000 (years after
signing the shareholders’ agreements), at which time she owned over 25% of the
shares of Throckmorton’s stock, making her the corporation’s largest shareholder. 
She was a minority shareholder in Olney.  She also had a checking account with
the First National Bank of Throckmorton that contained approximately $100,000. 
Daws’s will named Lindley as independent executor and bequeathed all of the
residuary estate (including almost all of the stock) to her.

          In August 2000, Lindley was officially appointed
as the independent executor of Daws’s estate, and a Wichita County court
admitted Daws’s will to probate.  During meetings occurring that same month, McKnight
advised the corporations’ boards of directors that the corporations had received
a copy of Daws’s will on July 26, 2000.  The minutes of the Throckmorton
meeting state that McKnight noted that “under the terms of the Shareholders[’]
Agreement, Mrs. Daws’[s] death constituted an ‘involuntary transfer’ of her
stock in the Corporation,” and the company had the “sole discretion to approve
or disapprove” the attempted transfer.  The minutes then explain that the
directors recognized 

the benefit to the Corporation and its
subsidiary bank of having local ownership and the support which the local shareholders
gave to the bank.  It was further noted that while the number of the
Corporation’s shareholders was less than the maximum permitted under the
Corporation’s Bylaws, it was still desirable not to increase the number of
shareholders.

          . . .  It was . . . recommended
that the Board of Directors disapprove the transfer to [Lindley], and that the
stock be redeemed in accordance with the terms of the Shareholders[’]
Agreement.

          Thus, the Throckmorton board disapproved the
transfer of ninety-two shares of stock to Lindley and voted that those shares
be redeemed through a payment of the book value of the stock as of December 31,
1999.[7] 
The Olney board took a similar action as reflected in minutes from its August
2000 meeting; the minutes state that corporation redeemed 625 shares of Olney
stock that Daws attempted to transfer to Lindley.

          On August 11, 2000, Bruce Crum, an attorney
for the corporations, sent a letter to Lindley informing her of the disapproved
transfer and redemption of the shares.  Crum expressed that he included copies
of audited financial statements for the corporations and that he also sent the
letter to Daws’s estate’s counsel.  Ten days later, Crum sent a letter to the
estate’s counsel that enclosed the corporations’ bylaws and the minutes of the
meetings that had occurred that month.

          Lindley sued McKnight, Throckmorton, Olney,
and Throckmorton’s and Olney’s shareholders.[8] 
Lindley asserted that appellees had implemented unenforceable shareholders’
agreements.  She sought declarations, under the Uniform Declaratory Judgments
Act (UDJA),[9]
that the agreements were unreasonable and void and that appellees had failed to
comply with them.  She also alleged that McKnight had breached a fiduciary duty
to Daws by failing to disclose the legal effect of the agreements upon her
estate, that appellees were liable for common law fraud and statutory fraud
based on alleged misrepresentations about the necessity and legal effect of the
agreements, and that appellees breached section three of the agreements by
failing to reject the stock transfers to her within twenty days of receiving
knowledge that she was the proposed transferee.[10] 
Lindley sought compensatory damages for the difference between the book value
and fair market value of Daws’s stock and for dividends and distributions on the
stock to which she claimed to be entitled.[11] 
She also asked for exemplary damages and attorney’s fees.

          Appellees filed answers that included
general denials[12]
and defenses. Appellees sought declaratory relief about the validity of the
shareholders’ agreements, asserting that they were reasonably drafted to keep
local ownership and ensure the viability of independent community banks.  Appellees
also asked the trial court to award attorney’s fees.

          Approximately five years after filing the
suit, Lindley filed a motion for partial summary judgment on her claim that the
agreements were void as a matter of law because they unreasonably restricted
the transfer of stock.  Appellees responded to Lindley’s motion and filed a no-evidence
motion for summary judgment on Lindley’s claims.  Appellees also filed a
traditional motion for partial summary judgment on their affirmative defenses. 
Lindley responded to both of appellees’ motions.  With leave of court, appellees
filed supplements to their traditional motion for summary judgment; the
supplements contended, among other arguments, that Lindley was estopped from
challenging the shareholders’ agreements.

          The trial court denied Lindley’s motion for
partial summary judgment and granted appellees’ motions for summary judgment.  Lindley
brought this appeal.

Summary Judgment Standards

          We review a summary judgment de novo.  Travelers
Ins. Co. v. Joachim, 315 S.W.3d 860, 862 (Tex. 2010).  We consider the
evidence presented in the light most favorable to the nonmovant, crediting
evidence favorable to the nonmovant if reasonable jurors could, and
disregarding evidence contrary to the nonmovant unless reasonable jurors could
not.  Mann Frankfort Stein & Lipp Advisors, Inc. v. Fielding, 289
S.W.3d 844, 848 (Tex. 2009).  We indulge every reasonable inference and resolve
any doubts in the nonmovant’s favor.  20801, Inc. v. Parker, 249 S.W.3d
392, 399 (Tex. 2008).  We must consider whether reasonable and fair-minded
jurors could differ in their conclusions in light of all of the evidence
presented.  See Wal-Mart Stores, Inc. v. Spates, 186 S.W.3d 566, 568
(Tex. 2006); City of Keller v. Wilson, 168 S.W.3d 802, 822–24 (Tex.
2005).            When both parties move for summary judgment and the trial
court grants one motion and denies the other, the reviewing court should review
both parties’ summary judgment evidence and determine all questions presented. 
Mann Frankfort, 289 S.W.3d at 848; see Myrad Props., Inc. v. Lasalle
Bank Nat’l Ass’n, 300 S.W.3d 746, 753 (Tex. 2009).  When a party moves for
both a traditional and a no-evidence summary judgment, we generally first
review the trial court’s summary judgment under no-evidence standards.  See
Ford Motor Co. v. Ridgway, 135 S.W.3d 598, 600 (Tex. 2004); All Am.
Tel., Inc. v. USLD Commc’ns, Inc., 291 S.W.3d 518, 526 (Tex. App.—Fort
Worth 2009, pet. denied).  “When the trial court does not specify the basis for
its summary judgment, the appealing party must show it is error to base it on
any ground asserted in the motion.  The appellate court must affirm the summary
judgment if any one of the movant’s theories has merit.”  Star-Telegram,
Inc. v. Doe, 915 S.W.2d 471, 473 (Tex. 1995) (citations omitted).

Traditional motions for
summary judgment for or against claims or defenses

 

          In a traditional summary judgment case, the
issue on appeal is whether the movant met the summary judgment burden by
establishing that no genuine issue of material fact exists and that the movant
is entitled to judgment as a matter of law.  Tex. R. Civ. P. 166a(c); Mann
Frankfort, 289 S.W.3d at 848.  The summary judgment will be affirmed
only if the record establishes that the movant has conclusively proved all
essential elements of the movant’s cause of action or affirmative defense.  City
of Houston v. Clear Creek Basin Auth., 589 S.W.2d 671, 678 (Tex. 1979); see
Chau v. Riddle, 254 S.W.3d 453, 455 (Tex. 2008).  If uncontroverted
evidence is from an interested witness, it does nothing more than raise a fact
issue unless it is clear, positive and direct, otherwise credible and free from
contradictions and inconsistencies, and could have been readily controverted. 
Tex. R. Civ. P. 166a(c); Morrison v. Christie, 266 S.W.3d 89, 92 (Tex.
App.—Fort Worth 2008, no pet.).

No-evidence motions for summary judgment

          After
an adequate time for discovery, the party without the burden of proof may,
without presenting evidence, move for summary judgment on the ground that there
is no evidence to support an essential element of the nonmovant’s claim or
defense.  Tex. R. Civ. P. 166a(i).  The motion must specifically state the
elements for which there is no evidence.  Id.; Timpte Indus., Inc. v.
Gish, 286 S.W.3d 306, 310 (Tex. 2009).  The trial court must grant the
motion unless the nonmovant produces summary judgment evidence that raises a
genuine issue of material fact.  See Tex. R. Civ. P. 166a(i); Hamilton
v. Wilson, 249 S.W.3d 425, 426 (Tex. 2008).  If the nonmovant brings
forward more than a scintilla of probative evidence that raises a genuine issue
of material fact, then a no-evidence summary judgment is not proper.  Smith
v. O’Donnell, 288 S.W.3d 417, 424 (Tex. 2009); King Ranch, Inc. v.
Chapman, 118 S.W.3d 742, 751 (Tex. 2003), cert. denied, 541 U.S.
1030 (2004).

 

Appellees’ No-Evidence Motion for Summary Judgment

          In
her third issue, Lindley contends that the trial court erred by granting
appellees’ no-evidence motion for summary judgment on her claims for breach of fiduciary
duty, fraud, statutory fraud, breach of contract, and declaratory judgment.  Because
we will hold below that one of appellees’ affirmative defenses precludes
Lindley’s recovery on her breach of contract and declaratory judgment claims as
a matter of law, we will examine only whether the trial court correctly granted
appellees’ no-evidence summary judgment motion on the breach of fiduciary duty,
fraud, and statutory fraud claims.

Breach of fiduciary duty

          Lindley pled that McKnight breached a
fiduciary duty to Daws by allegedly causing her to sign the shareholders’
agreements.  “The elements of a breach of fiduciary duty claim are:  (1) a
fiduciary relationship between the plaintiff and defendant, (2) a breach by the
defendant of his fiduciary duty to the plaintiff, and (3) an injury to the
plaintiff or benefit to the defendant as a result of the defendant’s breach.”  Lundy
v. Masson, 260 S.W.3d 482, 501 (Tex. App.—Houston [14th Dist.] 2008, pet.
denied).  Appellees moved for summary judgment on the basis that there is no
evidence of any of these elements.

          The effect of imposing a fiduciary duty is
to require the fiduciary party to place someone else’s interests above its
own.  Crim Truck & Tractor Co. v. Navistar Int’l Transp. Corp., 823
S.W.2d 591, 594 (Tex. 1992), superseded by statute on other grounds as
stated in Subaru of Am., Inc. v. David McDavid Nissan, Inc., 84 S.W.3d 212,
225–26 (Tex. 2002) (op. on reh’g).  Thus, Texas courts are reluctant to
recognize fiduciary relationships.  See Jones v. Thompson, No.
08-08-00245-CV, 2010 WL 3157145, at *8 (Tex. App.—El Paso Aug. 11, 2010, pet.
denied).

          Generally, “[a] director’s fiduciary duty
runs only to the corporation, not to individual shareholders or even to a
majority of the shareholders.”  Somers ex rel. EGL, Inc. v. Crane, 295
S.W.3d 5, 11 (Tex. App.—Houston [1st Dist.] 2009, pet. denied) (quoting Hoggett
v. Brown, 971 S.W.2d 472, 488 (Tex. App.—Houston [14th Dist.] 1997, pet.
denied)); see Redmon v. Griffith, 202 S.W.3d 225, 233 (Tex. App.—Tyler
2006, pet. denied).  As we have explained,

          While corporate officers owe
fiduciary duties to the corporation they serve, they do not generally owe
fiduciary duties to individual shareholders unless a contract or confidential
relationship exists between them in addition to the corporate relationship.  Due
to its extraordinary nature, the law does not recognize a fiduciary
relationship lightly.  Therefore, whether such a duty exists depends on the
circumstances.

          Fiduciary duties may arise from
formal and informal relationships and may be created by contract.  An informal
fiduciary duty may arise from a moral, social, domestic, or purely personal
relationship of trust and confidence, generally called a confidential
relationship.  A confidential relationship exists where influence has been
acquired and abused and confidence has been extended and betrayed.  A person is
justified in placing confidence in the belief that another party will act in
his best interest only where he is accustomed to being guided by the judgment
or advice of the other party and there exists a long association in a business
relationship as well as personal friendship.  Thus, the relationship must exist
prior to and apart from the agreement that is the basis of the suit.  And,
although a confidential relationship is ordinarily a question of fact for the
jury, it becomes a question of law when the trial court refuses to submit
issues on fiduciary duty based on no evidence.

Cotten v. Weatherford Bancshares, Inc., 187 S.W.3d 687, 698 (Tex. App.—Fort Worth 2006, pet.
denied) (footnotes and citations omitted); see Rice v. Metro. Life Ins.
Co., 324 S.W.3d 660, 679 (Tex. App.—Fort Worth 2010, no pet.) (upholding a
trial court’s summary judgment against a breach of fiduciary duty claim because
the appellant did not present more than a scintilla of evidence of a “special
relationship of confidence and trust”); see also Meyer v. Cathey, 167
S.W.3d 327, 329, 331 (Tex. 2005) (declining to recognize a fiduciary
relationship when, among other facts, the plaintiff and defendant were friends
who ate lunch together every day for four years); Crim Truck & Tractor
Co., 823 S.W.2d at 595 (explaining that “[n]either is the fact that the
relationship has been a cordial one, of long duration, evidence of a
confidential relationship”).

          In the trial court, Lindley asserted that an
informal, confidential relationship existed between McKnight and Daws because 

McKnight lived next door to [Daws] as a
child and teenager; he worked as a young man for [Daws’s] husband . . . ; he
assisted [Daws] in business transactions after her husband died . . . ; [Daws]
relied upon [McKnight] to act in her best interest; and [McKnight] was a pallbearer
at [Daws’s] funeral.

In Lindley’s affidavit, she said,

          I know that [Daws] had a close
personal and confidential relationship with [McKnight].  She often spoke of
it.  I know of several occasions on which [Daws] sought the advice and counsel
of [McKnight] in connection with her financial affairs.  I know that he advised
her in connection with at least one oil and gas lease that she entered into,
and that he assisted her in negotiating her royalty interest in that lease.  I
also know that [McKnight] would seek [Daws’s] counsel in connection with the
affairs of the First National Bank of Throckmorton because she was the largest
single shareholder in that bank.  At the time that [McKnight] was seeking to
form [Olney] in the late 1980’s [sic], he approached [Daws] and sought to get a
substantial investment from her in that company after he had initially inquired
as to whether she would oppose his using [Throckmorton] as the entity that
would acquire the various failed banks which ultimately became the banks owned
by [Olney].  [Daws] refused to let him use Throckmorton for that purpose, but
told him that she would invest with him if he acquired those banks using a
different entity . . . .

          I know that [Daws] trusted
[McKnight] to do the right thing for her, the banks[,] and their shareholders,
since [Daws’s] husband Jim Bob Daws had been the Chairman of the Throckmorton
bank for many years prior to [McKnight’s] ever becoming involved as an employee
or officer or shareholder of that bank.

          Appellees argue that “[c]onsidering only the
competent and admissible evidence . . . , Lindley falls short of raising a
material fact issue on the existence of a fiduciary relationship.”  In the
trial court, appellees objected to statements in the paragraphs quoted above on
the grounds that various parts of the paragraphs were based on hearsay, contained
conclusory statements, and violated rule 601 of the rules of evidence.[13] 
The trial court sustained these objections.  In her fourth issue, Lindley
challenges the trial court’s decision to sustain the objections.

          We review a trial court's evidentiary
rulings related to a motion for summary judgment for an abuse of discretion.  Cantu
v. Horany, 195 S.W.3d 867, 871 (Tex. App.—Dallas 2006, no pet.); Reynolds
v. Murphy, 188 S.W.3d 252, 259 (Tex. App.—Fort Worth 2006, pet. denied), cert.
denied, 549 U.S. 1281 (2007).  When a trial court acts “without regard for
any guiding rules or principles,” it abuses its discretion.  Owens-Corning
Fiberglas Corp. v. Malone, 972 S.W.2d 35, 43 (Tex. 1998).  We may
not conclude that a trial court abused its discretion merely because we would
have ruled differently in the same circumstances.  E.I. du Pont de Nemours
& Co. v. Robinson, 923 S.W.2d 549, 558 (Tex. 1995).  

          Lindley bears the burden of bringing forth a record
that demonstrates the trial court abused its discretion when it sustained
appellees’ objections to the summary judgment evidence.  See Cantu,
195 S.W.3d at 871.  We must uphold the trial court’s evidentiary rulings if
there is any legitimate basis in the record for the rulings.  Reynolds,
188 S.W.3d at 259.

          A summary judgment affidavit must be based
on personal knowledge, show that the affiant is competent to testify, and contain
facts that would be admissible in evidence at trial.  See Tex. R. App.
P. 166a(f); United Blood Servs. v. Longoria, 938 S.W.2d 29, 30 (Tex.
1997); Souder v. Cannon, 235 S.W.3d 841, 849 (Tex. App.—Fort Worth 2007,
no pet.).  Conclusory statements are not proper summary judgment proof.  See McIntyre
v. Ramirez, 109 S.W.3d 741, 749 (Tex. 2003); Ryland Group, Inc. v. Hood,
924 S.W.2d 120, 122 (Tex. 1996) (“Conclusory affidavits are not enough to raise
fact issues. . . .  They are not credible, nor susceptible to being readily
controverted.”); Brownlee v. Brownlee, 665 S.W.2d 111, 112 (Tex. 1984)
(same).  A conclusory statement is one that does not provide the underlying
facts to support the conclusion.  Souder, 235 S.W.3d at 849; Residential
Dynamics, LLC v. Loveless, 186 S.W.3d 192, 198 (Tex. App.—Fort Worth 2006,
no pet.).  

          For example, in Seaway Products Pipeline
Co. v. Hanley, an affidavit stated that a defendant “indicated he was
involved . . . in the development of . . . property.”  153 S.W.3d 643, 653
(Tex. App.—Fort Worth 2004, no pet.).  We held that the statement was
conclusory because it did not “set[] forth the facts to support what [the
defendant] did to ‘indicate’ that he was involved . . . in developing the
property.”  Id. at 654; see also Cammack the Cook, L.L.C. v. Eastburn,
296 S.W.3d 884, 895 (Tex. App.—Texarkana 2009, pet. denied) (reasoning that an
affidavit was conclusory because it alleged that a plaintiff’s attorney’s fee
calculation was unreasonable but did not provide a factual basis to make that
claim); Haynes v. City of Beaumont, 35 S.W.3d 166, 178 (Tex. App.—Texarkana
2000, no pet.) (holding that affidavits were conclusory when they stated that
an employee was terminated for “poor and unacceptable behavior” without disclosing
examples of such behavior).

          Appellees’ objections to the conclusory
nature of Lindley’s affidavit related (in part) to the following statements:

I know that [Daws] had a close personal
and confidential relationship with [McKnight].  She often spoke of it.  I know
of several occasions on which [Daws] sought the advice and counsel of
[McKnight] in connection with her financial affairs. . . .  I also know that
[McKnight] would seek [Daws’s] counsel in connection with the affairs of First
National Bank of Throckmorton because she was the largest single shareholder in
that bank. . . .

          I know that [Daws] trusted
[McKnight] to do the right thing for her, the banks and their shareholders,
since [Daws’s] husband Jim Bob Daws had been the Chairman of the Throckmorton
bank for many years prior to [McKnight’s] ever becoming involved as an employee
or officer or shareholder of that bank.

Assuming that these general statements are intended to
stand independently from the remaining, more specific parts of Lindley’s
affidavit that discuss Daws’s relationship with McKnight, we conclude that the
trial court could have reasonably determined that the statements do not contain
sufficient factual detail to qualify as proper summary judgment proof.   Lindley
failed to provide details about what Daws said to lead Lindley to
believe that a “close personal and confidential relationship” existed between
Daws and McKnight, what matters Daws sought McKnight’s counsel about, how
Lindley knew that Daws had sought his counsel, what matters McKnight
sought Daws’s counsel about, how Lindley knew that he had sought Daws’s
counsel, how Lindley knew that Daws trusted McKnight to “do the right
thing for her,”[14]
or why Daws’s husband’s role with the Throckmorton bank affected whether
Daws trusted McKnight.  Thus, we hold that the trial court did not abuse its
discretion by sustaining appellees’ objections to at least these statements,
and we overrule Lindley’s fourth issue to that extent.  See Reynolds,
188 S.W.3d at 259.

          We do not need to determine whether the
trial court erred by sustaining appellees’ objections to Lindley’s remaining statements
regarding Daws’s relationship with McKnight because we conclude that those
statements, along with the other evidence submitted by Lindley, do not raise a
genuine issue of material fact to establish a fiduciary duty owed by McKnight. 
See Tex. R. App. P. 47.1; Reynolds, 188 S.W.3d at 259. 
Specifically, we conclude that the following facts do not amount to more than a
scintilla of evidence to establish a confidential relationship:

·       
McKnight was Daws’s distant relative (McKnight hesitantly said
that he believed that Daws’s husband, who died several years before the events
relevant to this case, was his third or fourth cousin); 

 

·       
McKnight gratuitously advised Daws and other women in
connection with oil and gas matters that are unrelated to the corporations or
the issues involved in this case (his assistance was not special to Daws);[15]

 

·       
McKnight once approached Daws to ask for an investment;[16]

 

·       
McKnight lived close to Daws as a child and once worked for her
husband; and

 

·       
McKnight was a pallbearer at Daws’s funeral upon request by a
funeral director, and he attended her burial service.

 

These facts are common to ordinary friendly and
neighborly relationships; they do not demonstrate a special relationship of
trust and confidence.  We conclude, therefore, that the facts do not amount to
any material evidence that would justify the imposition of an extraordinary
fiduciary relationship.  See Meyer, 167 S.W.3d at 330–31; Rice,
324 S.W.3d at 679; Cotten, 187 S.W.3d at 698.  Thus, we hold that the
trial court did not err by granting summary judgment against Lindley’s breach
of fiduciary duty claim, and we overrule that portion of her third issue.

Common law and statutory fraud

          Next, Lindley contends that the trial court
erred by granting summary judgment against her fraud and statutory fraud
claims.  Lindley pled that appellees committed fraud and statutory fraud because
McKnight knowingly misrepresented the necessity and legal effect of the
shareholders’ agreements with the intent to obtain Daws’s signatures on them.  A
party commits fraud by (1) making a false, material misrepresentation (2)
that the party either knows to be false or asserts recklessly without knowledge
of its truth (3) with the intent that the misrepresentation be acted upon,
(4) and the person to whom the misrepresentation is made acts in reliance upon
it (5) and is injured as a result.  All Am. Tel., Inc., 291 S.W.3d at
527 (citing W.L. Lindemann Operating Co. v. Strange, 256 S.W.3d 766, 776
(Tex. App.—Fort Worth 2008, pet. denied)).  “The elements of statutory fraud .
. . are essentially identical to the elements of common law fraud except that [section
27.01 of the business and commerce code] does not require proof of knowledge or
recklessness as a prerequisite to the recovery of actual damages.”  Brush v.
Reata Oil & Gas Corp., 984 S.W.2d 720, 726 (Tex. App.—Waco 1998, pet.
denied); see Tex. Bus. & Com. Code Ann. § 27.01 (West 2009); Jones,
2010 WL 3157145, at *8.[17]

          Appellees asserted in the trial court that
Lindley had no evidence of a material misrepresentation, Daws’s reliance on a
misrepresentation, or Daws’s injury as the result of a misrepresentation.  In
response, Lindley first contended that she did not have a burden to produce
evidence of a misrepresentation because of McKnight’s alleged fiduciary
relationship with Daws (which we have concluded that Lindley failed to raise a material
fact issue on).[18]
 She then produced evidence that she claimed proved that (1) “[t]here was a
material misrepresentation made by [appellees] to [Daws]”; (2) “[t]he
material representation was false”; (3) “the knowledge of falsity and intent by
[appellees] that [Daws] act on the misrepresentations may be inferred from
other evidence”; and (4) “Daws and her estate were injured by the
misrepresentations.”  Appellees reiterated in their reply to Lindley’s response
that Lindley had not produced competent evidence of reliance.

          We agree that the competent evidence fails
to raise a genuine factual issue on reliance.  Lindley argues that the alleged misrepresentation
about the necessity of the shareholders’ agreements occurred when McKnight sent
his November 1996 letter to Olney’s shareholders.  The letter stated in part,

          In order to elect subchapter S
treatment, all shareholders and their spouses must agree in writing to the
election, and for this purpose we have enclosed . . . a Shareholders’
Agreement which must be signed by all shareholders and their spouses.  The Shareholders’
Agreement is designed to protect the election by restricting transfer of stock
to a shareholder who is not qualified to be an S Corporation shareholder under
the Internal Revenue Code.  The Board of Directors urges all shareholders and
their spouses to review carefully and execute the . . . Shareholders’
Agreement. . . .

          The Board of Directors strongly
recommends the S corporation election as being in the best interests of the Corporation
and its shareholders.  [Emphasis added.]

The italicized part of this letter might establish a
genuine factual dispute about whether McKnight misrepresented that the
shareholders’ agreements were required to achieve the corporations’ conversions
to Subchapter S entities because the corporations’ attorney, Craig, said that
the agreements were recommended but not necessary.  But Lindley did not provide
evidence showing that Daws relied on the letter’s statement about the necessity
of the shareholders’ agreements when she signed either of the agreements.  Lindley
did not show that the statement induced Daws to sign the agreements and that Daws
would not have signed them if the letter would have instead stated, for
example, that the agreements were not required to elect Subchapter S status but
that, as explained by Craig, they were only recommended.  Also, McKnight said
in his deposition (which Lindley attached to her response) that he told Daws,
whose percentage of stock owned increased because of a reverse stock split
associated with the conversions, that the corporations would be allowed to
restrict stock ownership “based on what was best” for the corporations.[19]

          In her affidavit, Lindley stated, 

I know that when [McKnight] told [Daws]
that she needed to sign the shareholders agreement with all of the terms that
they contained in order for the corporations to be able to elect Subchapter S
Corporation status that she relied on his word that all of the terms of those
agreements [were] necessary in order for Subchapter S Corporation status to be
elected.

          Appellees objected to this statement on the
grounds that it is conclusory and does not include predicate or foundation. 
The trial court sustained appellees’ objection.  For reasons similar to those
stated above, we hold that the trial court did not abuse its discretion by
sustaining the objection and excluding the statement.  See Reynolds, 188
S.W.3d at 259.  The trial court could have reasonably determined that the
statement is conclusory because it does not disclose underlying facts that
support Lindley’s supposed knowledge that Daws relied on McKnight’s statement
in his letter.[20] 
See McIntyre, 109 S.W.3d at 749; Ryland Group, Inc., 924 S.W.2d at
122.

          Without the statement expressly related to
reliance from Lindley’s affidavit, the remaining evidence produced in response
to appellees’ no-evidence motion does not raise a genuine factual dispute about
whether Daws relied on McKnight’s statements when she signed the shareholders’
agreements, even if those statements were false.  Therefore, we hold that the
trial court did not err by granting appellees’ no-evidence motion on Lindley’s
fraud and statutory fraud claims, and we overrule that part of Lindley’s third
issue.  See Tex. R. Civ. P. 166a(i); Hamilton, 249 S.W.3d
at 426; see also Tex. Bus. & Com.
Code Ann. § 27.01(a)(1)(B); Grant Thornton LLP v. Prospect High
Income Fund, 314 S.W.3d 913, 923 (Tex. 2010) (reiterating that fraud
requires “that the plaintiff show actual and justifiable reliance”).

Appellees’ Affirmative Defense of Acceptance of
Benefits

          Because we have held that the trial court
did not err by granting appellees’ no-evidence motion for summary judgment with
respect to Lindley’s breach of fiduciary duty, fraud, and statutory fraud
claims, we now consider whether the trial court correctly concluded that an
affirmative defense raised as part of appellees’ traditional motion for summary
judgment precludes Lindley’s breach of contract and UDJA claims.  As part of her
second issue, Lindley contends that the trial court erred by granting summary
judgment to appellees on the basis of their acceptance of benefits defense.

          In appellees’ September 2006
supplemental answer to Lindley’s second amended original petition, they pled
that Lindley’s claims were barred by the acceptance of benefits defense.  Appellees
raised only accord and satisfaction and judicial estoppel in their January 2006
“First Traditional Motion for Partial Summary Judgment.”  However, appellees
sought summary judgment on their acceptance of benefits defense in an October
2006 supplement to their traditional motion for summary judgment.  In January
2008, with leave of court, appellees again argued, in another supplement, that
Lindley was estopped from bringing her claims because of acceptance of
benefits.  Lindley’s response to appellees’ January 2008 supplement recognized
that appellees had raised an estoppel defense based on acceptance of benefits. 
In March 2009, appellees filed a motion that asked the trial court to rule on
the estoppel defense.  The trial court signed a final judgment in April 2009
that granted summary judgment for appellees based on their traditional motion
for summary judgment and “additional materials submitted and before the court.” 
Lindley’s briefing presents substantive arguments related to appellees’
acceptance of benefits defense; Lindley does not expressly argue that the
defense was not properly before the trial court or is not subject to our
consideration.  We will therefore consider the acceptance of benefits defense. 
See Nguyen v. Woodley, 273 S.W.3d 891, 899 & n.6 (Tex.
App.—Houston [14th Dist.] 2008, no pet.) (holding that a trial court correctly
granted summary judgment on a ground contained in a supplement that was filed
with leave of court); Mowbray v. Avery, 76 S.W.3d 663, 687–88 (Tex.
App.—Corpus Christi 2002, pet. denied) (overruling an appellant’s issue
concerning the trial court’s consideration of a supplemental motion for summary
judgment).

           As Lindley has recognized,
“acceptance of benefits” is a species of quasi-estoppel.  Lopez v. Muñoz,
Hockema & Reed, L.L.P., 22 S.W.3d 857, 864 (Tex. 2000); Duncan Land
& Exploration, Inc. v. Littlepage, 984 S.W.2d 318, 330 (Tex. App.—Fort
Worth 1998, pet. denied).  Quasi-estoppel is an
affirmative defense that precludes a party from asserting, to another’s
disadvantage, a right inconsistent with a position previously taken.  Clark
v. Cotten Schmidt, L.L.P., 327 S.W.3d 765, 770 (Tex. App.—Fort Worth 2010,
no pet.).  The defense applies when it would be unconscionable to allow a
person to maintain a position inconsistent with one to which he acquiesced or
from which he accepted a benefit.  Id.; Lopez, 22 S.W.3d at 864. 
Thus, quasi-estoppel forbids a party from accepting the benefits of a
transaction and then subsequently taking an inconsistent position to avoid
corresponding obligations or effects.  Clark, 327 S.W.3d at 770.

          For example, in Doe v. Tex. Ass’n of Sch.
Bds., Inc., we held that quasi-estoppel precluded a mother who obtained money
under a settlement agreement from contending that she did not have the
authority to provide the consideration required to secure the money.  283
S.W.3d 451, 464 (Tex. App.—Fort Worth 2009, pet. denied) (citing Brooks v.
Brooks, 257 S.W.3d 418, 423 (Tex. App.—Fort Worth 2008, pet. denied)). 
Similarly, in Eckland Consultants, Inc. v. Ryder, Stilwell Inc., the
Houston (First District) Court of Appeals held that quasi-estoppel prevented a
property inspection company from claiming that a plaintiff did not have
standing to sue for a breach of the inspection contract when the company
accepted the benefits of the contract and stated in a report that
noncontracting entities could rely on the inspection report.  176 S.W.3d 80,
81–83, 87–88 (Tex. App.—Houston [1st Dist.] 2004, no pet.); see also Mulvey
v. Mobil Producing Tex. & N.M. Inc., 147 S.W.3d 594, 608 (Tex. App.—Corpus
Christi 2004, pet. denied) (holding that quasi-estoppel barred a party from
challenging an agreement that it accepted benefits under); Twelve Oaks Tower
I, Ltd. v. Premier Allergy, Inc., 938 S.W.2d 102, 111 (Tex. App.—Houston
[14th Dist.] 1996, no writ) (same).

          Lindley’s UDJA and breach of contract claims
challenge either the validity of the shareholders’ agreements or the actions
that the corporations took under the agreements.  But Daws’s estate accepted
benefits that it could not have received if the agreements are not valid and
were not complied with.  On October 11, 2000, the corporations sent letters to
Lindley to explain that under provisions of the shareholders’ agreements that
were detailed in the letters, they had rejected Daws’s stock transfer to her
and had redeemed Daws’s shares.  The corporations informed Lindley that
they were paying her $358.03 per share for Daws’s 625 shares of Olney stock and
$5,543.89 per share for Daws’s ninety-two shares of Throckmorton stock that the
corporations redeemed.   Both letters stated, “At the request of
the Estate’s counsel, . . . we have delayed in remitting to the Estate proceeds
of the [stock] sale.  However, we do not believe we should continue to delay in
making payment.”  The record contains copies of checks (of $510,037.88 for the
Throckmorton shares and $223,768.75 for the Olney shares) sent by the
corporations to Daws’s estate and negotiated by Lindley.

          During
oral argument, Lindley’s counsel conceded, “The banks perfectly complied with
their obligations under the shareholders’ agreements when they tendered these
checks.”  It is undisputed that Lindley knew (by way of the letters) that the
corporations had disapproved of the transfers to her when she negotiated the
checks and that the checks were being issued for the redemption of the shares. 
The only reason that Daws’s estate could have been entitled to receive specific
payments totaling $733,806.63 is the redemption of the stock under section five
of the shareholders’ agreements.  When Lindley negotiated the checks, she obviously
knew of her claims that Key had read Daws’s will and that the corporations had
therefore allegedly received notice of Daws’s intended transfer to her because
Key allegedly read Daws’s will months before the checks were negotiated.  Throughout
the course of this litigation, which began in 2000, Lindley never returned the
money that the corporations tendered to Daws’s estate.  We conclude that it
would be unconscionable to allow Daws’s estate to retain the benefit it
received for the redemption of Daws’s shares while it concurrently challenges
the provisions of the shareholders’ agreements that made the redemption
possible.[21]  See Clark,
327 S.W.3d at 770.

          Citing Lopez, Lindley argues that the
“Estate’s initial acceptance of lesser payments in October 2000 . . . is not
inconsistent with the Estate’s subsequent assertion that it was entitled to
more.”  See 22 S.W.3d at 864.  In Lopez, a contingent fee
contract allowed a law firm to collect 45% of the recovery if the case was
appealed to a higher court rather than 40% if it was not.  Id. at 859. 
The law firm charged the Lopezes the additional 5% when the defendant initiated
the appeal even though the case was settled shortly afterward.  Id.  Three
years after the Lopezes received a distribution for 55% of the settlement, it sued
the firm, and the firm asserted that “acceptance of benefits” precluded the Lopezes’
fraud, negligence, and deceptive trade practices claims.  Id. at 860,
863.  In that context, the supreme court held that “the Lopezes’ initial
acceptance of a lesser portion of the settlement is not inconsistent with their
later assertion that they were entitled to more.”  Id. at 864.  Thus,
the supreme court concluded that by accepting 55% of the settlement, which the
Lopezes were undisputedly entitled to under any scenario, they were not
precluded from contending that they were entitled to 5% more under the same
provision of the contingent fee contract.  See id.

          Here,
however, Daws’s estate could not be entitled to any money under section
five of the shareholders’ agreement unless her shares were properly redeemed. 
And the shares could not have been properly redeemed if there is merit to
either of Lindley’s breach of contract or UDJA claims, which asked the trial
court to either invalidate the transfer restrictions in the shareholders’
agreements or find that the corporations violated them.  Thus, unlike in Lopez,
Lindley’s claim to be entitled to more money in this case is not based on the
same part of the contract to which Daws’s estate already received money; the
claim is instead premised on challenging the very mechanism from which the $733,806.63
was paid.

           We recognize that there can be no estoppel
from acceptance of benefits by a person who did not have knowledge of all
material facts.  Frazier v. Wynn, 472 S.W.2d 750, 753 (Tex. 1971); Clark,
327 S.W.3d at 770.  Lindley contends that she did not learn about the
“misrepresentations regarding the consent transfer restrictions until the bank
boards of directors refused to consent to the transfer of [Daws’s] stock.”  But
Daws’s estate was the real plaintiff in the trial court, not Lindley.[22] 
The summary judgment evidence shows that Daws knew of the transfer restrictions
before her death.  During McKnight’s deposition, he said that before the
corporations received Subchapter S status, he talked to Daws for about half an
hour about the possible conversions, told her that there would be limitations
on who could own stock once the conversions occurred, and informed her that the
boards of directors would have the authority to disapprove “any transfer of
stock.”  Furthermore, according to McKnight’s affidavit, the restrictions imposed
by the shareholders’ agreements were “conspicuously noted on all of the share
certificates of Olney and Throckmorton, including those issued to Nan Daws.”  Finally,
and most obviously, Daws signed the shareholders’ agreements that contained the
restrictions.  We must generally charge a party with knowledge of the contents
of a document that the party signed.  See EZ Pawn Corp. v. Mancias, 934
S.W.2d 87, 90 (Tex. 1996).

          More importantly, even if there was some
point in the past when Daws did not know of the transfer restrictions and the
corporations’ potential to refuse her intended devise of shares to Lindley,
Daws’s estate, through Lindley, accepted the benefit in question ($733,806.63)
at a time that it knew all facts regarding the distribution of that benefit and
the actual rejection of the transfer, as is evidenced by the corporations’
letters sent to Lindley in August and October 2000.  Cf. Frazier, 472
S.W.2d at 753 (holding that quasi-estoppel did not apply because the appellant,
who had orally leased land annually, did not have knowledge of a three-year
lease that was executed by her children at the time that she accepted $1,225 in
rent).

          For all of these reasons, we hold that the trial
court did not err by granting appellees’ traditional motion for summary
judgment against Lindley’s UDJA and breach of contract claims because appellees
established their acceptance of benefits (quasi-estoppel) defense as a matter
of law.  See Mann Frankfort, 289 S.W.3d at 848; Clark, 327 S.W.3d
at 770.  We overrule Lindley’s second issue to that extent.[23]

The Trial Court’s Award of Attorney’s Fees

          In her fifth issue, Lindley argues that the
trial court erred by awarding attorney’s fees to appellees.  In the trial
court, appellees filed an affidavit of D. D’lyn Davison, who was appellees’
attorney at the time of the trial court’s summary judgment decision.  The
affidavit recited Davison’s specialization in civil trial law and detailed the
work performed by her and appellees’ previous counsel in this litigation.  Davison
expressed her familiarity with customary fees awarded by attorneys practicing
in Wichita County, stated that the services rendered by appellees’ counsel were
necessary to properly represent appellees, and averred that appellees incurred
reasonable attorney’s fees of over $200,000.

          Lindley responded by asserting, among other
arguments, that appellees had failed to segregate the fees that were incurred
in connection with the UDJA claim from fees incurred in defending other causes
of action.  The trial court found that Lindley’s claims were “intertwined to
the point of being inseparable” and therefore awarded appellees the “entire
amount of attorney[’]s fees” they had sought, which was $201,356.76.[24]

          At the outset, because we have held that the
trial court properly granted summary judgment against Lindley’s UDJA claim, we
hold that the trial court did not abuse its discretion by determining that
appellees are generally entitled to reasonable and necessary attorney’s fees
based on that claim.[25] 
See Tex. Civ. Prac. & Rem. Code Ann. § 37.009; Bocquet v. Herring,
972 S.W.2d 19, 20–21 (Tex. 1998); Comm’rs Court of Titus County v. Agan,
940 S.W.2d 77, 81 (Tex. 1997); NP Anderson Cotton Exch., L.P. v. Potter,
230 S.W.3d 457, 466 (Tex. App.—Fort Worth 2007, no pet.) (explaining that the
“equity and justice of the fee award are left to the trial court’s discretion”).

          The majority of Lindley’s complaint about
the trial court’s award of attorney’s fees concerns the court’s alleged failure
to properly segregate the fees that the court awarded as to claims that permit
the fees from those that do not.  A party may recover attorney's fees only
if provided for by statute or by contract.  Gulf States Utilis. Co. v. Low,
79 S.W.3d 561, 567 (Tex. 2002).  “Parties seeking attorney’s fees under Texas
law ‘have always been required to segregate fees between claims for which they
are recoverable and claims for which they are not.’”  AMX Enters., L.L.P. v.
Master Realty Corp., 283 S.W.3d 506, 521 (Tex. App.—Fort Worth 2009, no pet.)
(quoting Tony Gullo Motors I, L.P. v. Chapa, 212 S.W.3d 299, 311 (Tex. 2006));
Potter, 230 S.W.3d at 466.  As the supreme court explained,

[I]f any attorney’s fees relate solely to
a claim for which such fees are unrecoverable, a claimant must segregate
recoverable from unrecoverable fees.  Intertwined facts do not make tort fees
recoverable; it is only when discrete legal services advance both a recoverable
and unrecoverable claim that they are so intertwined that they need not be
segregated. . . .

          . . . .

          . . .  [W]hen . . . it cannot be
denied that at least some of the attorney’s fees are attributable only to
claims for which fees are not recoverable, segregation of fees ought to be
required and the jury ought to decide the rest.

Chapa, 212
S.W.3d at 313–14; see Potter, 230 S.W.3d at 466 (“An exception to the
duty to segregate arises when the party’s claims are so interrelated that their
prosecution or defense entails proof or denial of essentially the same facts.”). 
Thus, a trial court is not required to segregate its attorney’s fee award when counsel’s
work performs “double service” to recoverable and unrecoverable claims.  Chapa,
212 S.W.3d at 313. 

          Lindley asserts that appellees would not
normally be entitled to an attorney’s fee award for defending any of the claims
she brought other than her UDJA claim.  Appellees do not dispute the general correctness
of this assertion.[26] 
Rather, they contend, in part, that Lindley’s pleading conflated her causes of
action to the extent that work performed by appellees’ attorneys to defeat
Lindley’s breach of contract, breach of fiduciary duty, and fraud claims concomitantly
defeated her UDJA claims.  We agree.

          Lindley’s second amended petition, which was
her live pleading during the summary judgment proceedings, based Lindley’s
fraud, statutory fraud, and breach of fiduciary duty claims on three alleged “Misrepresentations”: 
(1) McKnight’s telling Daws that she needed to sign the shareholders’
agreements for the corporations’ conversions to Subchapter S status; (2) McKnight’s
failure to disclose that the corporations could have made the conversions
without the execution of the shareholders’ agreements; and (3) McKnight’s
failure to disclose that the terms of the shareholders’ agreements could prevent
Daws from performing her estate plan to transfer shares to Lindley.  The
petition based Lindley’s breach of contract action on appellees’ alleged
failure to timely notify her of the rejection of the transfer of Daws’s stock
under the shareholders’ agreements.  With regard to Lindley’s UDJA claim, the
petition stated,

          In the further alternative,
[Lindley] is a person interested under the shareholders[’] agreements and whose
rights . . . are affected by same, and is therefore entitled to obtain a declaration
from this Court of such rights . . . pursuant to . . . the Texas Civil Practice
& Remedies Code. . . .  Plaintiff requests the Court to declare that the
shareholders[’] agreements, or various provisions thereof, are void because
they were procured by fraud . . . , or because they contain provisions which
are unreasonable restraints on alienation of [Daws’s] stock which are invalid
under Texas law.  Plaintiff further requests the Court to declare that the
Defendants, in any event, failed to comply with the shareholders[’] agreements
in seeking to exercise their purported rights to redeem [Daws’s] common stock
for only the book value price.

          Thus, Lindley’s petition shows that she
predicated her UDJA claim on the factual and legal theories that she offered in
support of each of her other claims.[27] 
In a similar case in which a hospital’s defense of a UDJA claim depended on the
same legal theory of its suit to recover on a lien, we held that the “resulting
legal fees were so intertwined that they need not be segregated.”  Speegle
v. Harris Methodist Health Sys., 303 S.W.3d 32, 40 (Tex. App.—Fort Worth
2009, pet. denied) (op. on reh’g).  Because appellees’ attorneys’ legal
services that responded to each of Lindley’s claims also necessarily served to
defend Lindley’s theory of recovery on her UDJA claim, for which an award of
attorney’s fees is authorized by statute, we conclude that the trial court was
not required to segregate its award of attorney’s fees.  See Chapa, 212
S.W.3d at 313–14; Cooper v. Cochran, 288 S.W.3d 522, 537 (Tex. App.—Dallas
2009, no pet.) (“When the legal services provided advance both a claim for
which attorney’s fees are recoverable and a claim for which they are not
recoverable, the claims are so intertwined that they need not be segregated.”);
cf. A & L Eng’g & Consulting, Inc. v. Shiloh Apollo Plaza, Inc.,
315 S.W.3d 928, 931 (Tex. App.—Dallas 2010, no pet.) (holding that a trial
court was required to segregate its award of attorney’s fees related to a UDJA
claim from fees related to defending a counterclaim because defending the
counterclaim “did nothing to advance” the UDJA action).

          Lindley also argues that appellees are not
entitled to attorney’s fees for services related to their unsuccessful motions to
transfer venue.  Through motions filed in 2001, appellees asked the trial court
to transfer venue to Throckmorton County.  The trial court overruled the
motions in 2003.  Lindley argues that a “substantial portion” of the trial
court’s attorney’s fee award relates to these motions and that there is no
basis to allow fees in connection with prosecuting motions to transfer venue.[28] 
But the motions to transfer venue, if granted, certainly would have affected appellees’
defense of Lindley’s UDJA claim along with the remainder of her suit.

          Moreover, Lindley does not cite authority
that establishes that a trial court must segregate specific services rendered
by an attorney that were successful for the attorney’s client from services
that were unsuccessful when awarding attorney’s fees to a party that prevailed
in the overall litigation of a UDJA claim.  Such a rule would be incongruous
with authority stating that in a UDJA action, “the trial court may award
attorney’s fees to the prevailing party, may decline to award attorney’s fees
to either party, or may award attorney’s fees to the nonprevailing party,
regardless of which party sought declaratory judgment.”  Brookshire Katy
Drainage Dist. v. Lily Gardens, LLC, 333 S.W.3d 301, 313 (Tex. App.—Houston
[1st Dist.] 2010, pet. filed) (emphasis added); see Indus. Commc’ns, Inc. v.
Ward County Appraisal Dist., 296 S.W.3d 707, 723 (Tex. App.—El Paso 2009,
pet. denied) (“The granting or denial of attorney’s fees in a declaratory
judgment action . . . is not dependent on a finding that a party substantially
prevailed.”).[29]

          Here, appellees are the prevailing parties
on Lindley’s UDJA claim.  Lindley contends that it is inequitable to require
her to pay attorney’s fees related to appellees’ motions to transfer venue that
she defeated.  But the trial court could have reasonably determined that Lindley
would not have been required to defend those motions apart from bringing her lawsuit,
which the trial court ultimately found to be unmeritorious.  We conclude
that the trial court acted within its sound discretion by awarding attorney’s
fees to appellees for a service by their attorney that was incidental to their
defense of Lindley’s UDJA claim even if the service did not directly affect the
ultimate resolution of the claim.[30] 
See Potter, 230 S.W.3d at 466; see also Templeton v. Dreiss, 961
S.W.2d 645, 671 (Tex. App.—San Antonio 1998, pet. denied) (upholding an award
of attorney’s fees in a UDJA case that was based in part on time spent on
defending a motion for sanctions).

          For all of these reasons, we overrule
Lindley’s fifth issue.

Conclusion

          Having overruled all of Lindley’s issues, we
affirm the trial court’s judgment.

 

                                                                             TERRIE
LIVINGSTON

                                                                             CHIEF
JUSTICE

 

PANEL:  LIVINGSTON, C.J.; MCCOY and MEIER, JJ.     

 

DELIVERED:  July 7, 2011









[1]See
generally 26 U.S.C.A. §§ 1361–1363 (West 2011); see also Thomas v.
Thomas, 738 S.W.2d 342, 344 (Tex. App.—Houston [1st Dist.] 1987, writ
denied) (explaining that Subchapter S status “provides an alternate method to
tax the corporation’s income”).  A disclosure memorandum sent by Olney to its
shareholders in November 1996 explains that a Subchapter S election allows a
corporation’s income to be passed through to shareholders’ individual income
tax returns.





[2]The
number of shareholders was limited to thirty-two because a state law provision
would have included executive officers’ salaries in the calculation of
franchise tax if there were more than thirty-five shareholders.





[3]The
Olney shareholders’ agreement contains provisions that are substantially
similar to those in the Throckmorton agreement.  The reference in section three
of the Throckmorton agreement to the mandated disapproval of a transfer if “it
would cause the record number of Shareholders of the Corporation to exceed
thirty-two” is changed in the Olney agreement to state that disapproval must
occur if “it would be a violation of Section 7.05(b) of the Corporation’s
Bylaws.”  That section, as effective on December 1, 1996, states that except on
the written consent of the Olney board, the corporation’s number of
shareholders could not exceed fifty.





[4]As
Lindley argued in the trial court, the corporations’ bylaws do not dictate that
the corporations’ shareholders be customers of the corporations’ banks or
otherwise contribute to them.  Nor do the bylaws require shareholders to be
residents of the counties in which the corporations or banks are located.





[5]See
26 U.S.C.A. § 1362(a)(2).





[6]Today,
an S corporation may have up to 100 shareholders.  See id. § 1361(b)(1)(A).






[7]Lindley
still has the original certificate for Daws’s Throckmorton shares.  She says
that she “refused to return it after being notified in October 2000” that
Throckmorton had redeemed the shares.





[8]Lindley
referred to McKnight, Throckmorton, and Olney as “Defendants”; she referred to
the shareholders as “Respondents.”  She included some appellees in her original
petition and added others to the suit at a later time; for simplicity, we will
refer to the parties that Lindley sued in December 2000 as “appellees,” and we
will use the term “appellees” to refer to actions taken by McKnight,
Throckmorton, and Olney even if the other appellees did not explicitly join the
actions.





[9]See
Tex. Civ. Prac. & Rem. Code Ann. §§ 37.001–.011 (West 2008).





          [10]Lindley
said in an affidavit that Bryan Robertson Key, the secretary of Throckmorton
and president of the First National Bank of Throckmorton, read Daws’s will. 
Lindley asserts that the corporations received notice of her identity as the
proposed transferee of Daws’s stock when Key read the will and that the
corporations improperly rejected the transfer more than twenty days later.

 





[11]In
her pleading, Lindley did not specify the amount of damages that she requested.






[12]In
his original answer, McKnight specifically denied that he visited Daws in a
hospital “or did anything to cause her to sign the Shareholders[’]
Agreements.”  Lindley testified in a deposition that McKnight visited Daws in
1996 to obtain Daws’s signature on “papers”; McKnight testified that he visited
her in December of that year to obtain a proxy so that her Throckmorton shares
could be voted, but he did not recall discussing specific terms of the
shareholders’ agreements with her at that time.





[13]In
lawsuits brought by executors, neither party “shall be allowed to testify
against the others as to any oral statement by the testator . . . unless that
testimony to the oral statement is corroborated or unless the witness is called
at the trial to testify thereto by the opposite party.”  Tex. R. Evid. 601(b).





[14]Subjective
trust does not transform a business arrangement into a fiduciary relationship. 
Meyer, 167 S.W.3d at 331; Pabich v. Kellar, 71 S.W.3d 500, 505
(Tex. App.—Fort Worth 2002, pet. denied) (op. on reh’g).





[15]The
assistance for the oil and gas matters occurred in the 1990s.  In a deposition
that Lindley submitted, McKnight said that he helped Daws to “make sure that
the oil companies . . . were fair.”  He explained that he would “help nearly
anyone that asked for the help and never charge a fee.”





[16]Arms-length
transactions entered for parties’ mutual benefit do not establish a basis for
imposing a fiduciary relationship.  Meyer, 167 S.W.3d at 331.





[17]In
a statutory fraud case, the plaintiff may receive exemplary damages if it
proves the defendant’s actual awareness of the falsity of a representation.  Tex. Bus.
& Com. Code Ann. § 27.01(c).





[18]“Texas
courts have applied a presumption of unfairness to transactions between a
fiduciary and a party to whom he owes a duty of disclosure, thus casting on the
fiduciary the burden to establish fairness.”  Miller v. Miller, 700
S.W.2d 941, 946 (Tex. App.—Dallas 1985, writ ref’d n.r.e.) (op. on reh’g).





[19]McKnight
testified in his deposition that he discussed the Olney shareholders’ agreement
with Daws in person after she received the letter.  During the conversation,
McKnight told Daws that she could not transfer shares to a church, and McKnight
also talked to Daws about another shareholder who was upset about the reverse
stock split.  McKnight could not recall any other specific subjects of the
conversation.  As appellees argue, there is no evidence that McKnight even knew
of Daws’s desire to leave shares to Lindley at the time he sent the letter to
Daws or talked to her about the Olney shareholders’ agreement, so there is also
no evidence that the purpose of the letter or conversation was to override the
intentions she expressed in her will.  Furthermore, contrary to Lindley’s
argument, the letter to Olney’s shareholders (as quoted above) does not
represent that the boards of directors would “only refuse to permit the
shareholders to transfer their bank stock to persons . . . who were not
permitted by federal law to be subchapter S corporation shareholders.” [Emphasis
added.]  The express terms of the shareholders’ agreement, which was enclosed
with the letter, provided otherwise, and the letter told the shareholders to
carefully review the agreement.





[20]We
therefore overrule the part of Lindley’s fourth issue that challenges the
exclusion of this statement from Lindley’s affidavit.





[21]Daws’s
estate, through Lindley, also acquiesced to the redemption of the shares
through the shareholders’ agreements in another way.  After the estate received
a notice of an estate tax deficiency from the Internal Revenue Service (IRS) in
September 2004, the estate alleged that the IRS had overvalued Daws’s interest
in the corporations’ shares and asserted that the correct fair market value
matched the book value that the estate had received from the corporations in
October 2000.





[22]As
noted above, Lindley filed the lawsuit as Daws’s estate’s independent executor.





[23]Our
analysis to this point resolves the trial court’s decision to grant summary
judgment against all of Lindley’s claims.  Lindley raises other arguments in
her first through fourth issues that are not necessary to the disposition of
the claims as set forth herein, so we will not address those arguments, and we
overrule the remainder of Lindley’s first through fourth issues as moot.  See
Tex. R. App. P. 47.1; Hawkins v. Walker, 233 S.W.3d 380, 395 n.47 (Tex.
App.—Fort Worth 2007, pet. denied).





[24]The
trial court also conditionally awarded attorney’s fees related to Lindley’s
appeal of the trial court’s summary judgment decision.





[25]Apart
from the specific contentions discussed below, Lindley does not raise
challenges on appeal to the general sufficiency of the evidence to prove that
appellees’ attorney’s fees are reasonable and necessary.





[26]We
note that an award of attorney’s fees is generally inappropriate for defending
claims for breach of contract, breach of fiduciary, and fraud.  See MBM Fin.
Corp. v. Woodlands Operating Co., 292 S.W.3d 660, 667 (Tex. 2009); W. Reserve
Life Assurance Co. of Ohio v. Graben, 233 S.W.3d 360, 377 (Tex. App.—Fort
Worth 2007, no pet.); Cytogenix, Inc. v. Waldroff, 213 S.W.3d 479,
490–91 (Tex. App.—Houston [1st Dist.] 2006, pet. denied).





[27]Also,
appellees’ acceptance of benefits defense, which we have held precludes
Lindley’s UDJA and breach of contract claims, provided “double service.”  See
Chapa, 212 S.W.3d at 313.





[28]In
a document attached to Davison’s affidavit, she asserted that only $3,749.69 of
appellees’ total fee was incurred because of services related to the motions to
transfer venue.





[29]We
note that federal courts, while attempting to apply Texas law, have stated that
a party may recover for time spent on unsuccessful motions as long as it
succeeds in the overall claim.  See, e.g., DP Solutions, Inc. v.
Rollins, Inc., 353 F.3d 421, 434 (5th Cir. 2003).





[30]We
note that Lindley does not assert that appellees’ motions to transfer venue
were frivolous or brought in bad faith.